DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, James Reaster, appeals the December 24, 2002 judgment entry of the Lucas County Court of Common Pleas which, following a jury trial, found appellant guilty of murder and tampering with evidence. The trial court sentenced appellant to 15 years to life in prison for murder and 3 years in prison for tampering with evidence. The sentences were ordered to be served concurrently. This appeal followed.
 {¶ 2} The relevant facts are as follows. On the evening of January 24, 2002, the victim, Nelson Shepherd, appellant, James Reaster, and appellant's neighbor, Robert Brown, were drinking gin and Sprite at appellant's house located at 2222 Seaman Street in Toledo, Lucas County, Ohio. At approximately 10:00 to 11:00 p.m., Shepherd became involved in an altercation with Brown. The events culminated in Shepherd's death, caused by a broken neck. Appellant admitted that following Shepherd's death he carried his body out to Shepherd's car and placed him in the driver's seat; after several hours appellant called 9-1-1.
 {¶ 3} On June 19, 2002, appellant was indicted on one count of murder, in violation of R.C. 2903.02(B), and one count of tampering with evidence, in violation of R.C. 2921.12(A). On June 25, 2002, appellant entered a not guilty plea to the charges. On August 14, 2002, appellant and the state entered into a written stipulation that the results of the polygraph examination, which was conducted on August 19, 2002, could be used at trial. On December 16, 2002, appellant waived his right to a jury trial as to the tampering with evidence charge; the matter proceeded to jury trial on the murder charge and a bench trial on the tampering with evidence charge.
 {¶ 4} During the trial, the state presented the following relevant evidence. Toledo Police Officers Carol Scherer and Leah Lewis responded to a 9-1-1 call on January 25, 2002, at approximately 12:45 p.m. Scherer testified that they received a "code three" call of a "person down in a vehicle" at 2220 Seaman Street in Toledo, Lucas County, Ohio.
 {¶ 5} Scherer testified that when they arrived at the location, the vehicle that was described was in the driveway and that a man was slumped behind the steering wheel. Shortly thereafter, the fire department arrived and pronounced the man dead.
 {¶ 6} Scherer stated that they were approached by appellant who identified himself as the individual who called 9-1-1. According to Scherer, appellant stated that the man in the vehicle was his uncle and that he, along with another man, were over at his house drinking. Appellant stated that his uncle and the man began fighting; they damaged some items in appellant's home so he kicked them out around midnight.
 {¶ 7} Appellant told Scherer that the next morning he noticed that appellant's car was still in the driveway; he thought his uncle was just asleep after drinking too much the night before. Scherer testified that appellant stated that he left in his vehicle and when he returned, he unsuccessfully tried to wake the man. Appellant then called 9-1-1.
 {¶ 8} During cross-examination, Scherer acknowledged that appellant told her that while the man and his uncle were fighting, they had fallen down the hole or stairs to the basement. Appellant also told Scherer that the man involved in the fight lived across the street and that his name was Bobby Brown. Appellant pointed out Brown's coat that he had left on the front porch.
 {¶ 9} Toledo Police Officer and Scherer's partner, Leah Lewis, described the individual found in the vehicle as a white, older male. His face was discolored and he had dried blood around his nose. Lewis stated that the man had his left hand on the steering wheel; he was fully dressed but the bottom part of his shirt was unbuttoned, exposing his stomach.
 {¶ 10} Lewis also testified that appellant approached and identified himself as the 9-1-1 caller. Lewis stated that appellant explained to them that he had been doing some work in his house and that there was an eight foot drop in the floor that the neighbor and his uncle fell down. Appellant stated that the men were tearing up his house and had broken some of his son's toys; appellant then kicked them out.
 {¶ 11} Lieutenant Richard Reed testified that on January 25, 2002, he responded to a request for assistance in the 2200 block of Seaman Street. Reed testified that he spoke with appellant. According to Reed, appellant told him that the man in the car was his cousin and that his name was Nelson Shepherd. Appellant explained that the prior evening appellant, Brown, and Shepherd were all at appellant's home drinking Spite and gin in celebration of the birth of Shepherd's twin granddaughters. Appellant stated that around midnight, Shepherd jumped up and began physically assaulting Brown. The two began wrestling and rolling around on the floor; they fell through a large opening in the floor which led to the basement. Reed indicated that he personally observed the hole and that it was two and a half to three feet wide and six to seven feet long. Reed stated that there was a set of steps "but it kind of dropped right down to the basement." Appellant told Reed that after the men fell, they came back upstairs and they continued arguing; the men broke some of appellant's son's toys and appellant threw them out. Appellant also threw Brown's coat out on the front porch; it was still lying there.
 {¶ 12} According to Reed, appellant stated that after he threw the men out, he went to bed. Around 8:00 a.m., appellant got up and began working in the basement where he was rebuilding a wall. Appellant stated that once he realized that he had the wrong mortar he headed out to Home Depot. When he was leaving, he saw Shepherd in his car but thought that he was just "sleeping it off" because he had been drinking heavily the night before. When appellant returned, he unsuccessfully tried to wake Shepherd and then called 9-1-1.
 {¶ 13} Reed testified that appellant's demeanor was fairly calm. Appellant was somewhat emotional and "kind of clingy" to his mother, he had his arm around her. Appellant signed a waiver of a search warrant form and allowed the officers to search his home. When Reed went into appellant's home the first thing he noticed was a very strong smell of bleach. Reed testified that it appeared as though the furniture had been pushed over to one side and that the floor was extremely clean for January. When asked, appellant admitted that there had been some blood on the floor from the fight and that he had cleaned it up. Reed stated that the basement floor was wet and had also been scrubbed. There was a bucket with water that had a strong odor of bleach.
 {¶ 14} After viewing appellant's home, Reed asked appellant for his Home Depot receipt. Appellant stated that he did not have the receipt and admitted that he never went to Home Depot. Appellant told Reed that he went to his mother's house.
 {¶ 15} During cross-examination, Reed clarified that appellant admitted to cleaning up where the fight took place prior to Reed entering the house. Reed further described the hole that appellant stated that Shepherd and Brown fell down. Reed testified that it was a rectangular opening in the floor with no railing or board or gate. The hole was 32 to 36 inches wide and 6 or 7 feet long. In order to get down to the basement, Reed had to bend over and go down loose steps.
 {¶ 16} Detective Scott Smith, of the Toledo Police Department scientific investigations unit, testified next. Smith testified that he was called to investigate the scene at 2220 Seaman Street, where Shepherd was found in his car, and appellant's home at 2222 Seaman Street. Smith testified as to a series of photographs he took of Shepherd in his vehicle. Shepherd was slumped in the driver's seat, his knees up against the dashboard. Shepherd's left hand was lying on the bottom of the steering wheel and he was shoeless.
 {¶ 17} Regarding the photographs he took of appellant's house, Smith testified that he found no signs of blood or broken toys during his initial search of the home. Smith found and photographed two empty gin bottles.
 {¶ 18} Smith went across the street to Robert Brown's house. He testified that he photographed what appeared to be blood on one of Brown's tennis shoes. The shoes were taken into evidence.
 {¶ 19} During cross-examination, Smith indicated that the odor of bleach in appellant's house was mainly in the basement and was slight to mild. Smith also admitted that he was neither asked to nor did he look for broken toys.
 {¶ 20} Toledo Police Detective William Goetz, also of the scientific investigations unit, testified next. Goetz stated that the second time police searched appellant's house they found suspected blood on the floor and on the chair in the living room. Goetz testified that they took some pieces of the particle board floor and took swabs from the chair. Goetz also indicated that he transported the trash from appellant's home to police headquarters; he analyzed and photographed the contents. No toys were found in the trash.
 {¶ 21} Goetz photographed Brown's and appellant's injuries. The photographs depicted that Brown had an injury to his left knuckle, dried blood on his face and mustache and his right eye was swollen shut, and he had an injury to his toe and left shin. Brown also had bruising on his forearm and bruising and abrasions on his right side. Appellant's injuries included an abrasion on his right wrist. Goetz also testified that he photographed Shepherd's autopsy; the photographs were admitted into evidence.
 {¶ 22} Goetz was cross-examined regarding the extent of Brown's injuries as compared to appellant's injuries. Goetz agreed that Brown appeared to have been involved in an altercation.
 {¶ 23} Toledo Police Detective William Seymour testified that on January 25, 2002, he interviewed appellant. The videotaped interview was admitted into evidence and played for the jury. During the interview, appellant gave his version of the January 24, 2002 events. Appellant stated that Shepherd arrived before noon that day to help him work in the basement. Around lunchtime, appellant and Shepherd, in appellant's pick-up truck, went and got food and stopped at a few other locations. Later, at approximately 6:00 or 7:00 p.m., and again in appellant's truck, the pair went to Ray's Party Store and purchased a bottle of gin and some Sprite. Appellant stated that they had planned to celebrate the birth of Shepherd's twin granddaughters.
 {¶ 24} According to appellant, Shepherd went across the street to invite Brown over. They were all drinking and finished the bottle of gin. Around 8:00 or 9:00 p.m., the three returned to Ray's for another bottle of gin and more Sprite. Appellant stated that Brown and Shepherd were drinking heavily and that they were both alcoholics.
 {¶ 25} Appellant told Seymour that Brown and Shepherd began taunting each other; they were each boasting: "I'm stronger than you," they began pushing and then punching each other. Appellant said that the two fell down the basement steps, Brown first then Shepherd.
 {¶ 26} Seymour testified that he had listened to a 9-1-1 call received on January 25, 2002. Seymour identified the voice on the call as appellant's. The audiocassette of the tape was played for the jury. Appellant, on the tape, stated that there was a man in a car next door that was not moving despite appellant's attempts to wake him. Appellant described the man as a white male about 70 to 80 years old. Appellant gave his correct name and telephone number.
 {¶ 27} Seymour was cross-examined regarding his assessment of appellant's intellectual level. Seymour acknowledged that he believed appellant to be "a little bit on the slower side." Seymour also observed that appellant got emotional when talking about the fact that Shepherd never got to see his new granddaughters.
 {¶ 28} Lucas County Deputy Coroner, Cynthia Beisser, testified regarding the autopsy she performed on Shepherd. Dr. Beisser testified that she went to the scene at 2220 Seaman Street and observed Shepherd while he was still in his car. Dr. Beisser stated that there was not a lot of blood or other evidence to give her an indication as to the cause of his death. The next day, January 26, 2002, Dr. Beisser performed an autopsy on Shepherd who, at the time of death was 65 years old and weighed 167 pounds; his blood alcohol level was 1.5 per cent. Dr. Beisser first testified regarding the external examination. She stated that the right side of Shepherd's face had "extensive contusions and lacerations and abrasions." Shepherd had a contusion and abrasion on his left flank and a bruise on his right fourth finger. Shepherd also had abrasions on his left knee and right ankle and a laceration on his penis. Dr. Beisser agreed that the injury to Shepherd's penis could likely have been caused by the zipper of his pants being hit hard enough to damage the tissue underneath.
 {¶ 29} As to the internal examination, Dr. Beisser testified that Shepherd's neck was broken between the base of the skull and the first vertebra. Dr. Beisser testified that this type of injury results in sudden death and is generally caused by a catastrophic trauma such as a traffic accident or violent injury where the individual lands on his head or neck. Dr. Beisser stated that it would be highly unlikely for the type of injury Shepherd sustained to be caused by someone striking Shepherd. Further, in this particular case Dr. Beisser found no evidence that the soft tissues in the neck had sustained a blow.
 {¶ 30} Other internal trauma that Dr. Beisser observed included blood under the scalp behind the forehead and in the back of the head. Shepherd had patches of blood under the scalp, indicating blows to those areas. Shepherd also had a small amount of blood over the right side of the brain. In Dr. Beisser's opinion, the injuries to Shepherd's scalp and the bleeding inside the skull occurred before his neck was broken. According to Beisser, this is so because after the neck is broken, the heart immediately stops and no bleeding occurs.
 {¶ 31} During cross-examination, Dr. Beisser acknowledged that Shepherd lost a very small amount of blood during the altercation. Dr. Beisser was questioned regarding potential causes of a broken neck other than those she had previously articulated. Dr. Beisser responded that she has never seen this type of injury in any scenarios other than a traffic accident or a fall.
 {¶ 32} Regarding Shepherd's other injuries, Dr. Beisser agreed that most of the trauma was on Shepherd's right side of his face; however, there was no broken facial bones. She also indicated that based upon all the bruising on Shepherd's body, a fight must have taken place prior to his neck being broken.
 {¶ 33} Robert Brown testified next. Brown stated that he entered a plea to involuntary manslaughter for his involvement in Shepherd's death. Brown testified that on January 24, 2002, he lived at 2227 Seaman Street. On that date, Brown had known Shepherd for about four or five years and had met him through appellant. Brown testified that he had known appellant for approximately seven years and had worked for him cutting down trees and chopping wood.
 {¶ 34} On January 24, at approximately 6:30 p.m., Shepherd invited Brown over to appellant's house for a drink. When Brown arrived, about half a bottle of gin remained. Brown stated that he had two drinks from that bottle before it was gone. The three then went to Ray's Party Store in appellant's truck; Brown went in and purchased another bottle of gin.
 {¶ 35} Brown testified that Shepherd became upset because appellant was disputing the fact that he owed Shepherd money. Brown stated that sometime after this discussion, Shepherd stood up and began punching the top of Brown's head. Brown was eventually able to stand up; he was knocked to the floor several times and got back up in an attempt to defend himself. Ultimately, Brown was stuck lying on the floor with Shepherd punching and kicking him. Brown testified that Shepherd was a lot larger than he was; Brown stated that he is 5 feet 4 inches tall and weighs about 130 pounds.
 {¶ 36} According to Brown, appellant eventually intervened, pulling Shepherd off of Brown. Brown testified that appellant threw Shepherd a few feet. While Shepherd was on the ground, appellant was punching him. Brown stated that he kicked appellant "on his armpit." Brown testified that he did not fall down the basement steps during the altercation with Shepherd and that the fight was nowhere near the basement "hole." Brown stated that while Shepherd was being "kicked and stomped and punched" by appellant, Brown decided that he did not want any part of the fight and left without his coat and house keys. Brown slept next door at his neighbor's house.
 {¶ 37} Brown stated that when he left appellant's house, Shepherd was still alive "but then his chest started having some type of spasms," his "chest was spazzing out pretty bad." Brown agreed that it appeared as though Shepherd was dying. Brown did not learn that Shepherd, in fact, had died until a detective told him the next day.
 {¶ 38} On the morning of January 25, 2002, Brown had, at some point, left his neighbor's house, crawled through one of his windows, and gone back to sleep. Brown was awakened by a detective knocking on his door. The police took custody of Brown's tennis shoes and following DNA testing, it was determined that Shepherd's blood was on Brown's shoes.
 {¶ 39} During cross-examination, defense counsel questioned Brown about the altercation between him and Shepherd. Brown stated that once he got up from the table he punched Shepherd two times. Brown testified that Shepherd then punched him and he lost consciousness. Shepherd continued to punch and kick him. After appellant pulled Shepherd off of Brown, Brown stated that he kicked Shepherd two times.
 {¶ 40} Brown was questioned regarding his statement to Toledo Police Detective Scott that when he left appellant's house Shepherd was "fine." Brown testified that the statement to Scott was wrong. Brown was also questioned regarding the injuries on his knuckles; he claimed that he fell to the ground with his fist folded. Brown also testified that he did not know how the injury to his toe occurred. Brown did state that he did not fall down the stairs; he claimed that at no time during the night were any of them near the hole. Further, Brown acknowledged that, on the night Shepherd died, he was taking anti-seizure medication and was not supposed to consume alcoholic beverages.
 {¶ 41} The state's final witness was Toledo Police Sergeant Keefe Snyder. Snyder testified that he is in charge of the Toledo Police Department's scientific investigation unit and the polygraph section. Snyder participated in the January 25, 2002 investigation of appellant's house.
 {¶ 42} Snyder testified that he conducted the August 19, 2002 polygraph examination of appellant. Snyder stated that polygraph examination results are generally not admissible at trial but that appellant and the state signed a stipulated agreement as to their admissibility. Prior to the test, Snyder interviewed appellant; he went over appellant's statement and made sure that appellant understood the questions that were going to be asked during the examination.
 {¶ 43} Before the polygraph, appellant admitted that he had been untruthful in prior statements to police. Appellant stated that on January 24, 2002, a fight ensued between Brown and Shepherd. The two fell down the hole to the basement, came back up, began drinking again, and then began fighting again. Appellant told Snyder that he asked Brown and Shepherd to leave because they broke some of his son's toys and were "tearing up" the house. After they left, appellant went into the bathroom. While in the bathroom, appellant heard someone yell out "boss" which is what Shepherd called him.
 {¶ 44} When he came out of the bathroom he saw Brown "stomping" on Shepherd's head and that Brown then began to urinate on Shepherd. Appellant told Snyder that Brown did a "wrestling type motion with his arm" and came down on Shepherd. Appellant stated that he heard Shepherd's neck crack. Appellant told Snyder that he eventually began shooting Shepherd with a BB gun to get him to stop. While Brown was still beating Shepherd, appellant stated that he was trying to do CPR on him. Appellant tried to call 9-1-1 but Brown kicked the telephone out of his hand and left the house.
 {¶ 45} After Brown left, appellant picked up Shepherd and carried him to his car. Appellant told Snyder that the reason he did not call 9-1-1 and the reason he cleaned up the house was that he did not want his son to know that someone had died there. Appellant stated that the only time he touched Shepherd was to carry him to his car.
 {¶ 46} Turning to the polygraph, Snyder testified that he asked appellant six relevant questions pertaining to Shepherd's death. Appellant was asked if he killed Shepherd, caused the death of Shepherd, was lying, and if Brown was telling the truth about appellant brutally beating Shepherd as he was leaving. Appellant answered "no" to all the questions. Snyder's opinion was that Shepherd was being deceptive in his responses to all six questions. Snyder's report was admitted into evidence.
 {¶ 47} During cross-examination, Snyder testified that on January 25, 2002, he cleaned the wound on Brown's left toe and that, at that time, Brown stated that the laceration was from kicking Shepherd. Brown also told Snyder that Shepherd was "out cold" when he left appellant's house. Appellant's counsel elicited from Snyder that if an individual lies on one of the questions, there is a possibility of "bleed through" or of that answer affecting other responses.
 {¶ 48} Appellant, during his case-in-chief, called Toledo Police Detective James Scott who interviewed Brown on January 25, 2002. Scott testified that he had listened to Brown's trial testimony and that it did not "differ greatly" from Brown's prior statement. Scott stated that there were a few inconsistencies. On January 25, 2002, Brown admitted to kicking the victim in the head; however, at trial, Brown stated that he kicked Shepherd in the armpit. The videotape of the interview was then played for the jury. Thereafter, Scott did acknowledge that Brown, when pushed, did admit to kicking Shepherd despite an earlier denial. It was noted during cross-examination that Brown's statements that he did not fall into the basement and that he did not move the body, never changed.
 {¶ 49} At the conclusion of the testimony, the jury found appellant guilty of murder and the trial court found appellant guilty of tampering with evidence. This appeal followed.
 {¶ 50} On appeal, appellant raises the following assignment of error: {¶ 51} "1. The verdict of guilty with regard to the charge of felonious murder against Mr. Reaster was both not supported by the sufficiency of the evidence and against the manifest weight of the evidence."
 {¶ 52} The Ohio Supreme Court has ruled that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."State v. Thompkins (1997), 78 Ohio St.3d 380, 386. "Sufficiency" pertains to a question of law as to whether the evidence is legally adequate, as to all the elements of the crime, to support a jury verdict. Id. Reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. However, under a manifest weight standard, an appellate court sits as the "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. Thompkins at 387. The appellate court, "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id., quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. While an appellate court may determine that a judgment is sustained by sufficient evidence, it may still conclude that the judgment is against the weight of the evidence. (Citations omitted.) Id. Since appellant's assignment of error encompasses both sufficiency and manifest weight issues, we must apply both standards.
 {¶ 53} Appellant was convicted of murder, in violation of R.C. 2903.02(B). To support this conviction, the state had to prove, beyond a reasonable doubt, that appellant caused the death of Shepherd while committing or attempting to commit a first or second degree felony offense of violence, which does not constitute voluntary or involuntary manslaughter. In the present case, the state attempted to prove felonious assault, in violation of R.C. 2903.11 which provides, in part:
 {¶ 54} "(A) No person shall knowingly do either of the following:
 {¶ 55} "(1) Cause serious physical harm to another or another's unborn; * * *."
 {¶ 56} "Serious physical harm" is defined, in relevant part, as any of the following:
 {¶ 57} "(b) Any physical harm that carries a substantial risk of death;
 {¶ 58} "(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, serious disfigurement.
 {¶ 59} "(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
 {¶ 60} "(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C.2901.01(5).
 {¶ 61} Appellant's first argument is that his conviction is not supported by the manifest weight of the evidence and that there was not sufficient evidence provided to support the underlying felony of felonious assault. Specifically, appellant contends that the record is devoid of evidence that the victim suffered any serious physical harm, other than the injury that caused his death.
 {¶ 62} We first note that the determination of witness credibility is primarily for the trier of fact. State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Looking at the testimony presented by the state, Brown testified that when he was being beaten by Shepherd appellant pulled him off and threw him three to four feet. Brown punched Shepherd a couple of times and kicked him. When Brown left, Shepherd was on the ground "being kicked and stomped and punched" by appellant. Brown testified that Shepherd's chest was "spazzing out" and it looked like he was dying.
 {¶ 63} Regarding Shepherd's internal and external injuries, other than his broken neck, Dr. Cynthia Beisser testified that Shepherd had "extensive blunt force injuries on the right side of his face." Shepherd also had an area of abrasion and contusion on his left flank, a bruise on his finger, abrasions on his left knee and ankle, and a laceration on his penis. Internally, Shepherd had patches of blood under the scalp which, according to Beisser, indicated blows directly to his head. Shepherd also had a film of blood in the subdural space, which is over the right side of the brain. Beisser testified that these injuries took place before Shepherd's neck was broken. Additionally, the photographs of these injuries were admitted into evidence at trial. Viewing this evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the underlying crime of felonious assault were proven beyond a reasonable doubt.
 {¶ 64} Furthermore, we find that the above finding was not contrary to the manifest weight of the evidence. We have independently examined the credibility of the witnesses and the evidence presented and must conclude that the jury did not lose its way or create and manifest miscarriage of justice in finding that appellant knowingly caused Shepherd serious physical harm.
 {¶ 65} Appellant next contends that appellant's conviction under R.C. 2903.02(B), was against the manifest weight of the evidence where the deputy coroner testified that Shepherd's injury, which resulted in his death, was not likely caused by human force. We disagree.
 {¶ 66} The evidence presented by the state in this case was predominantly circumstantial; however, "[e]ven murder convictions can rest solely on circumstantial evidence." State v. Jackson
(1991), 57 Ohio St.3d 29, 38, citing State v. Nicely (1988),39 Ohio St.3d 147, 150. Moreover, "[w]hen the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." State v. Jenks, 61 Ohio St.3d at paragraph one of the syllabus.
 {¶ 67} During the course of the police investigation, appellant's version of the events dramatically changed. Appellant initially stated that he found Shepherd in his vehicle when he was going to Home Depot; appellant, after being asked to produce his receipt, later admitted that he never went to Home Depot. Appellant also admitted to scrubbing the area where the fight took place with bleach.
 {¶ 68} Months later, prior to submitting to the polygraph examination, appellant stated that Brown did a "wrestling move" on Shepherd and that he heard his neck snap. Appellant's version of how Shepherd died is inconsistent with the coroner's testimony that such an injury is caused by a catastrophic trauma such as a traffic accident or a fall. Appellant stated that he never touched Shepherd and only carried him to his car so his son, who was not there at the time, would not learn that someone had died in the house.
 {¶ 69} Conversely, Brown's version of the facts did not radically change. Admittedly, although Brown downplayed his involvement in Shepherd's death; he eventually admitted that he punched and kicked Shepherd multiple times. Brown testified that when he left appellant's house, appellant was punching, kicking, and stomping on Shepherd and that Shepherd's chest was "spazzing out."
 {¶ 70} Finally, we note that the jury was in the best position to judge the conflicting evidence presented at trial. See State v. DeHass, 10 Ohio St.2d at paragraph one of the syllabus. By stipulation of the parties, the jury also had the results of appellant's polygraph examination, which showed appellant to be untruthful. Accordingly, after careful review of the entire record and independently weighing the evidence, we cannot find that the jury lost its way and created a manifest miscarriage of justice in convicting appellant of murder.
 {¶ 71} Based on the foregoing, we find that appellant's murder conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. Appellant's assignment of error is not well-taken.
 {¶ 72} On consideration whereof, we find that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal for which sum judgment is rendered against appellant on behalf of Lucas County and for which execution is awarded. See App.R. 24.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Pietrykowski, J., Skow, J., Parish, J. Concur.