[Cite as *State v. Christon*, 2017-Ohio-9235.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-16-1266

    Appellee                              Trial Court No. CR0201501986

v.

Donald Christon                              **DECISION AND JUDGMENT**

    Appellant                             Decided:  December 22, 2017

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**OSOWIK, J.**

**{¶ 1}** This is an appeal from a judgment of the Lucas County Court of Common

Pleas which, following a bench trial, found appellant guilty of murder and sentenced him

to a life prison term.  For the reasons set forth below, this court affirms the judgment of

the trial court.

{¶ 2} Appellant, Donald J. Christon, III, lived with his mother, Juanita Wilson, along with her young grandson Delbert Lear, and the victim, Tony Wilson, variously described in the record as appellant's older brother, half-brother or cousin.

{¶ 3} In the early hours of June 16, 2015, appellant used a butcher knife to stab the victim five times in the chest, left arm and back. Appellant and the victim were in the kitchen when a dispute arose about food from the refrigerator and the slamming of the refrigerator door. Mr. Lear and Mrs. Wilson were asleep in the home at the time. Mr. Lear, who was downstairs, awoke because of the commotion in the kitchen and saw appellant stabbing the victim. Mr. Lear went upstairs to notify his grandmother, Mrs. Wilson. Appellant left the victim in the kitchen, sat on the couch in the front room of the house, and thought about calling the police while he still held the knife. When Mrs. Wilson realized what happened to the victim, she told Mr. Lear to call 9-1-1, and he did so by reporting the stabbing.

{¶ 4} Upon entering the front door the first responder, Toledo Police Sergeant Williams, who arrived within two minutes of dispatch, found the victim and Mrs. Wilson holding appellant down on the couch because appellant still wielded the bloody butcher knife. Sergeant Williams ordered appellant to drop the knife, and appellant calmly responded he would not do so until the victim got off him. The victim did so and slumped to the ground bleeding heavily. Mrs. Wilson continued to hold down appellant's arm holding the knife. Appellant finally dropped the knife. Sergeant Williams ordered appellant to stand up, turn around, and place his hands behind his back. Appellant

2.

complied. Appellant was arrested, and the victim was transported to a hospital where he later died. The Lucas County Coroner ruled the victim's death a homicide as the result of "multiple sharp force trauma" stabbings by another person. Many witnesses heard appellant admit to stabbing the victim multiple times.

{¶ 5} Appellant was indicted on June 23, 2015, on two counts of murder in violation of R.C. 2903.02(A), 2903.02(B) and 2929.02, and submitted a written plea of not guilty by reason of insanity.

{¶ 6} On August 29, 2016, appellant voluntarily waived his right to a jury trial, and a bench trial commenced. On September 1, 2016, the trial court found appellant not guilty of Count 1, murder in violation of R.C. 2903.02(A) and 2929.02. The trial court then found appellant guilty of Count 2, murder in violation of R.C. 2903.02(B) and 2929.02. Subsequently on October 11, 2016, the trial court sentenced appellant to serve a prison term for life with parole eligibility after 15 years, as required by R.C. 2929.02(B)(1). The trial court journalized the sentencing judgment entry on October 14, 2016.

{¶ 7} It is from the trial court's October 14, 2016 journalized judgment entry which appellant filed his appeal on November 10, 2016.

{¶ 8} Appellant sets forth two assignments of error:

I. The trial court erred in finding that Appellant failed to establish an affirmative defense of not guilty by reason of insanity.

3.

II. The trial court's denial of Appellant's affirmative defense and finding of guilty was against the manifest weight of the evidence produced at trial.

{¶ 9} We will address both assignments of error together.

{¶ 10} Appellant argues that he met his burden of proof for the affirmative defense of not guilty by reason of insanity by producing the testimony of Dr. Babula, a psychology expert who diagnosed appellant as suffering from the mental illness of paranoid schizophrenic and opined appellant did not know the wrongfulness of his acts on June 16, 2015. Appellant argues the trial court failed to give sufficient weight to Dr. Babula's opinion while giving greater weight to Dr. Sherman's opinion that appellant's schizophrenia did not inhibit appellant's ability to know the wrongfulness of his acts. Appellant urges the trial court erred and should have given more credibility to Dr. Babula's opinion because he conducted "a more thorough and complete examination than the evaluation conducted by Dr. Sherman." Appellant also argues Dr. Sherman incorrectly assumed appellant was charged with murder with firearms specifications. Thus, appellant's assignments of error collectively argue that his murder conviction was against the manifest weight of the evidence demonstrating he was not guilty by reason of insanity because Dr. Babula's expert testimony was preponderantly more credible than Dr. Sherman's.

{¶ 11} In response appellee argues appellant did not meet his burden of proof for the affirmative defense of not guilty by reason of insanity. Appellee argues that appellant

4.

admitted to stabbing the victim multiple times. Appellee argues Dr. Sherman's opinion and the evidence showed that although appellant suffered from schizophrenia, he knew the difference between right and wrong and knew the wrongfulness of his stabbing actions on the victim on June 16, 2015. Appellee further argues if appellant was not guilty by reason of insanity at the time he committed the murder, "he would not have presented as a calm, collected individual mere minutes after the offense." Consequently, appellee argues the trial court did not abuse its discretion when it judged the credibly of the experts and, therefore, properly exercised its discretion when it determined appellant failed to prove the affirmative defense of not guilty by reason of insanity and found appellant guilty of Count 2.

{¶ 12} "A challenge to the weight of the evidence questions whether the greater amount of credible evidence was admitted to support the judgment than not." *Flowers v. Siefer*, 6th Dist. Lucas No. L-16-1002, 2017-Ohio-1310, ¶ 94. This court has repeatedly stated that in determining whether a verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way to create such a manifest miscarriage of justice as to require a new trial. *State v. Reynolds*, 6th Dist. Lucas No. L-16-1021, 2017-Ohio-1478, ¶ 47. A conviction will be overturned only in exceptional cases. *Id.* Every "reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Flowers* at ¶ 94.

5.

{¶ 13} In this case the trial court judge was the trier of fact by consent of the appellant. It is well established that the trier of fact has the sole duty to decide what weight should be given to the testimony of any witness, including experts. *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 92, 652 N.E.2d 671 (1995); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. This is also true for the defense of not guilty by reason of insanity: "weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of the facts." *State v. Thomas*, 70 Ohio St.2d 79, 434 N.E.2d 1356 (1982), syllabus. We will not reverse those decisions absent an abuse of discretion where the record shows the decision was unreasonable, arbitrary or unconscionable. *Flowers* at ¶ 59; *Kinn v. HCR ManorCare*, 2013-Ohio-4086, 998 N.E.2d 852, ¶ 14 (6th Dist.).

{¶ 14} A not guilty by reason of insanity plea must be made in writing. Crim.R. 11(A); R.C. 2943.04. The record shows appellant properly submitted his written plea to the trial court on September 9, 2015.

{¶ 15} For the Count 2 offense of murder, appellee did not have the burden to prove appellant's sanity as any element of that crime. R.C. 2903.02(B). Rather, appellant was required to prove by a preponderance of the evidence his affirmative defense of not guilty by reason of insanity. R.C. 2901.05(A); *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35. To prove the defense, appellant must demonstrate "that at the time of the commission of the offense, [appellant] did not know,

6.

as a result of a severe mental disease or defect, the wrongfulness of [appellant's] acts." R.C. 2901.01(A)(14). "Preponderance of the evidence is defined as 'that measure of proof that convinces the judge or jury that the existence of the fact sought to be proved is more likely than its nonexistence.'" *In re Z.G.*, 6th Dist. Erie No. E-12-063, 2013-Ohio-2482, ¶ 31. Appellant attempted to do so by requesting three mental health expert evaluations resulting in conflicting opinions of criminal liability. R.C. 2945.371(A), (G). "When from the evidence reasonable minds may reach different conclusions upon the question of insanity, such question is one of fact for the trier of fact." *Reynolds*, 2017-Ohio-1478, at ¶ 48.

{¶ 16} After appellant raised the issue of his competence to stand trial, the record shows the trial court scheduled a competency hearing. R.C. 2945.37(B). Appellant is presumed competent to stand trial unless, after a hearing, the trial court "finds by a preponderance of the evidence that, because of the [appellant's] present mental condition, the [appellant] is incapable of understanding the nature and objective of the proceedings against the [appellant] or of assisting in the [appellant's] defense * * *." R.C. 2945.37(G). The trial court then ordered appellant to Thomas Sherman, M.D., the Medical Director of the Court Diagnostic & Treatment Center for an evaluation of his competence to stand trial and of his criminal responsibility, i.e., mental condition at the time of the offense charged. R.C. 2945.371(A), (G)(3), (G)(4).

{¶ 17} Dr. Sherman evaluated appellant on October 23, 2015. Dr. Sherman diagnosed appellant with schizophrenia paranoia. With respect to R.C. 2945.371(G)(3),

7.

Dr. Sherman opined in a report appellant "is currently capable of understanding the nature and objective of the proceedings against him and is currently capable of assisting in his defense." With respect to R.C. 2945.371(G)(4), Dr. Sherman opined in a separate report that at the time of the offense, appellant's "mental illness did not prevent him from knowing the wrongfulness of his acts." In a later report Dr. Sherman affirmed his opinion with respect to appellant's criminal liability following review of additional medical records and evidence provided by appellant dating to 2010.

{¶ 18} On October 29, 2015, appellant requested the trial court obtain a second opinion, which the trial court granted. The trial court rescheduled the competency hearing. The trial court then ordered appellant to Bob Stinson, Psy.D., a Board Certified Forensic Psychologist at Stinson & Associates, Inc., for an evaluation of his competence to stand trial, of his criminal responsibility, and for a general psychological evaluation. R.C. 2945.371(A), (G)(3), (G)(4); R.C. 2967.22.

{¶ 19} Between December 10, 2015, and March 22, 2016, appellant requested eight time extensions to receive and review Dr. Stinson's report, which the court granted in each instance.

{¶ 20} Dr. Stinson evaluated appellant on December 1, 2015. Dr. Stinson diagnosed appellant with continuous schizophrenia paranoia. The record does not show that Dr. Stinson provided any written reports or opinions with respect to R.C. 2945.371(G)(3) and 2967.22 as required by R.C. 2945.371(G). With respect to R.C. 2945.371(G)(4), Dr. Stinson opined in a report that at the time of the offense, appellant's

8.

mental illness was "severe" and, when combined with "other factors (e.g., his history of interpersonal conflict with his brother, an escalating argument at the time of the offenses charged), [appellant] perceived a threat, against which he believed he needed to defend himself by taking the life of his would-be assailant, lest he and/or other family members be harmed. Whether this argues for a self-defense, an insanity defense, another defense, or no defense is for the trier of fact to determine." In a later report, Dr. Stinson amended his opinion with respect to appellant's criminal responsibility following review of additional information provided by appellant: "At the time of the offenses charged, due to his severe mental disease, [appellant] did not know the wrongfulness of his acts charged. Rather, due to his severe mental disease, he perceived a threat from which he believed, in his psychotic state, that he needed to defend against and was, therefore, justified in defending against, including using lethal means."

{¶ 21} Appellant then requested the trial court obtain a third opinion, which the trial court granted. The trial court then ordered appellant to Mark Babula, Psy.D., a Clinical Psychologist at Central Behavioral Healthcare, Inc., for a criminal liability evaluation. R.C. 2945.371(G)(4).

{¶ 22} Dr. Babula evaluated appellant on April 11, 2016. Dr. Babula diagnosed appellant with "a psychotic disorder." With respect to R.C. 2945.371(G)(4), Dr. Babula opined in a report that at the time of the offenses charged, appellant "did not know the wrongfulness of the acts charged. The information in this evaluation suggests that he was impaired due to mental illness, to an extent that accurate perception and judgment of his

9.

own behavior was not possible. * * * [I]t appears that his mental state at the time was not reflecting reality, impairing his ability to judge right and wrong on the situation."

{¶ 23} The competency hearing was held, but appellant does not include in the record the transcript of that hearing. App.R. 9(A)(1). However, as reflected in the trial court's May 6, 2016 judgment, the trial court states the competency hearing occurred on May 5, 2016, and appellant requested the matter be set for trial on June 27, 2016. Then as reflected in the trial court's June 30, 2016 judgment, on June 27, 2016, appellant requested to continue the trial date until August 29, 2016, which the court granted because the ends of justice so required. R.C. 2945.02. It is well-settled that where appellant did not include a transcript of the May 5, 2016 competency hearing, we must assume the regularity of the hearing. *State v. Grimes*, 2017-Ohio-2927, ¶ 20. By the trial court setting two trial dates at appellant's request, we can reasonably presume appellant was found to be competent by the trial court to stand trial. Moreover, the record reflects Dr. Sherman's unrebutted opinion that appellant was "capable of understanding the nature and objective of the proceedings against him and is currently capable of assisting in his defense."

{¶ 24} The bench trial began August 29, 2016. Appellant and appellee agreed to a number of stipulations regarding the authenticity and admissibility of 46 exhibits. Appellee called as witnesses three police officers and Dr. Sherman.

{¶ 25} Sergeant Williams, a 13-year veteran of the Toledo Police Department, testified at trial he received specialized training as part of the Crisis Intervention Team to

10.

respond to calls with people who are suffering from a mental illness. On June 16, 2015, Sergeant Williams responded to a call of a "domestic situation" with "a person stabbed." He was already in the vicinity and arrived within two minutes of the dispatch call. Additional police assistance arrived within two minutes thereafter. When Sergeant Williams arrived, he found a boy about 8-12 years old, Delbert Lear, outside pointing to the house where inside there was a mass of people on a love seat involved in an altercation. Sergeant Williams described the scene he found as follows:

> I went in and at that point that's when I saw three people on what appeared to be a love seat. Tony Wilson was on the bottom, he was kneeling on his knees on the floor. Donald Christon was sitting back in the love seat. And Juanita Wilson was holding down Donald Christon with her hands. * * * Tony Wilson was at his – at Donald's knees, he was leaning [into] to him. It looked like he was trying to hold him down at the legs, hold his legs down at the time. * * * [Juanita Wilson] was on top of Donald holding his arms down. When I was approaching, she was asking me please don't shoot him, please don't shoot him is what I remember her saying. And there was a butcher knife in Donald's right hand.

{¶ 26} Sergeant Williams further testified as to appellant's behavior upon his arrival at the scene.

> Q. Okay, so you placed your left hand I believe you said?
>
> A. Yes.

11.

Q. On [Christon's] hand?

A. Right wrist, yes.

Q. Right wrist. What, if anything happened next?

A. At that point again I asked him to drop the knife. He said he would drop the knife when Tony Wilson got off of him, Tony got off of his legs. So at that point Tony[,] it appeared that he tried moving back and he fell to the ground and I could see that he had been stabbed multiple times. * * * It looked like in the torso area. There was blood everywhere and I didn't know how many times or anything like that, but it appeared he had been stabbed in the torso area.

Q. You could see blood on this person?

A. Yes, and on the pool of blood on the floor also.

Q. So Mr. Wilson rolls off, what, if anything happens next?

A. At that point Mr. Christon did drop the knife and it went off to the side of the couch. I believe what happened was I asked Juanita if she could get up and she did, and I asked Mr. Christon to stand up and place his hands behind his back and he did comply and took him, put him [into] handcuffs.

{¶ 27} Sergeant Williams then testified appellant admitted to stabbing the victim immediately following his arrest and transportation to be booked. The police cruiser dash

cam video of appellant's transportation to the police headquarters downtown, known as the Safety Building, was among the stipulated evidence admitted into the record.

Q. Okay. And you said – well, during your transportation did you speak to Mr. Christon at all?

A. I believe I did, yes, to some small talk back and forth. When I first put him in I did ask him what, what was going on and he did mention to me there was an altercation where Tony had slammed the refrigerator door and that was why he stabbed him.

Q. So Mr. Christon told you he stabbed Tony?

A. Yes, he did.

{¶ 28} Sergeant Williams described appellant as non-argumentative and calm, "like nothing had really happened." Appellant was responding to Sergeant Williams in a "normal demeanor." He testified appellant "[j]ust didn't show any remorse for what had just happened, just carrying on a conversation."

{¶ 29} Toledo Police Officer Ellerbrock testified at the trial he arrived second on the scene on June 16, 2015, and found Mrs. Wilson and the victim holding down appellant on a couch. He described appellant's demeanor at the crime scene and throughout the subsequent booking process as "calm." He testified appellant complied with all commands while transporting appellant from the Safety Building to the Lucas County Jail.

13.

**{¶ 30}** Toledo Police Detective Mattimore testified at the trial he was called in on June 16, 2015, to commence the crime investigation. In the course of his investigation, Detective Mattimore testified, "[w]hen I talked to Delbert Lear he stated that he witnessed Mr. Christon stab Tony Wilson and then when I interviewed Mr. Christon he told me that he stabbed Tony Wilson." Detective Mattimore also described appellant as compliant and cooperative. When Detective Mattimore went through the *Miranda* warnings with appellant, Detective Mattimore testified appellant was able to understand and sign the Miranda warnings. We note the videos of appellant's booking process and investigation interview were among the stipulated evidence admitted into the record.

**{¶ 31}** Due to scheduling constraints, the parties consented to appellant calling his sole witness, Dr. Babula, out of order.

**{¶ 32}** Appellant and appellee stipulated Dr. Babula was an expert in the area of psychology. Dr. Babula testified at the trial he had a 60-minute clinical interview, plus a 30-minute personality assessment, with appellant at the Lucas County Jail on April 11, 2016. He also reviewed appellant's medical records, previous psychological evaluations, including those by Drs. Sherman and Stinson, court records, and spoke with Mrs. Wilson, appellant's mother, by phone. Dr. Babula's diagnostic impression of appellant to a reasonable degree of psychological certainty was "paranoid schizophrenia" on June 16, 2015, and on April 11, 2016. Dr. Babula testified that appellant's past medical records showed appellant historically had periods of agitation and anger and that "over a fairly short period of time he could then return to a state of relative calm." Dr. Babula's expert

14.

opinion to a reasonable degree of psychological certainty was that on June 16, 2015, appellant's paranoid schizophrenia "impeded his ability to distinguish right from wrong."

{¶ 33} Even the court directly questioned Dr. Babula:

Q. How can paranoid schizophrenia affect a person's ability to understand the wrongfulness of their conduct?

A. With specifically active symptoms, what the individual is seeing or thinking does not accurately reflect reality. So if they are – with paranoid delusion, they are seeing danger, they are seeing fear that does not exist, so they are getting wrong information in or they are processing wrong information that they then can't accurately assess right or wrong because what they're working with isn't accurate.

Q. So it's like looking through the world with incorrect glasses?

A. Correct.

{¶ 34} Appellee then called its final witness, Dr. Sherman. Appellant had no objection to deeming Dr. Sherman an expert in the area of psychology. Dr. Sherman testified at trial he has 40 years of experience with court ordered evaluations for issues of not guilty by reason of insanity, competency to stand trial, civil guardianship and medical treatment. With respect to not guilty by reason of insanity, Dr. Sherman testified Ohio's statute has changed over the years. "The statute in Ohio deals only with knowledge of wrongfulness, has nothing to do with irresistible impulses, has nothing to do with whether or not the act was a product of a mental illness. These are past statutes."

15.

**{¶ 35}** Dr. Sherman further testified he had a 75-minute clinical interview with appellant at the Lucas County Jail on October 23, 2015. Dr. Sherman testified appellant admitted stabbing the victim for "making a lot of noise, opening and closing the refrigerator door." This was the "third [confrontation] in like a year. And what Mr. Christon told me is * * * that Mr. Christon happened to have a knife in his hand at the time because he was cutting up some leftovers, and in the course of the conversation he thought that the victim was threatening him or menacing him or something so he stabbed the victim."

**{¶ 36}** Dr. Sherman found appellant made a bad judgment that was not the result of an acutely mentally ill person. Dr. Sherman's opinion to a reasonable degree of medical or professional certainty was that although appellant was "mentally ill at the time of the offense[,] that mental illness was not severe enough to have impacted his knowledge of wrongfulness." At trial he testified, "As I mentioned earlier, I have no doubt [Christon] was mentally ill at the time, but the issue with my opinion had to do with severity of that mental illness. It's my opinion based upon, you know, literally hundreds of evaluations of this type and that in order for you to not understand the wrongfulness of your acts, you have to be very very very sick, and he was not."

**{¶ 37}** Not guilty by reason of insanity is when a person is "so sick mentally that they don't know right from wrong," according to Dr. Sherman. An insane person's "act is out of character," usually with no history between the defendant and the victim.

16.

**{¶ 38}** Dr. Sherman testified appellant's medical records of his 2010 and 2011 mental illness treatments showed appellant was hearing voices, talking to himself, irritable and smiling inappropriately. According to Dr. Sherman, on June 16, 2015, the dash cam video of appellant's behavior shortly after appellant fatally stabbed the victim showed appellant acting completely differently.

Q: And you said you reviewed some additional video after authoring your reports * * *?

A: Which gave strong confirmation to my opinion.

Q: How so?

A: The dash cam video consisted of basically a ride downtown to the Safety Building. There was one officer which I thought was pretty significant because if Mr. – if the defendant was acting irrationally they would have never put him in the car with one officer. The officer was very very polite, he was very professional, and he was just chatting with the defendant. The important thing is that the defendant chatted back to him. It was a perfectly lucid conversation. They could have been two friends. Nothing bizarre, unusual, nothing that would have confirmed the presence of a serious mental illness.

**{¶ 39}** Dr. Sherman was then asked about episodic schizophrenia, which he said is not an accepted diagnosis in the profession:

Q: And those symptoms or the constellation of symptoms I think you called it, do they rapidly onset?

A: There are times when they do have a rapid onset but ordinarily that is a different kind of illness, that's called a brief psychotic reaction and that can clear pretty quickly and generally never comes back again. This is usually in the process of an acute stress, a death in the family, something along those lines. * * * Schizophrenia, however, that doesn't go away. It doesn't go away unless it's treated.

* * *

Q: So there was testimony * * * earlier that schizophrenia symptoms can be episodic, they can be quick onset and just as quickly the symptoms would dissipate or no longer be present.

A: Well that might – you're speaking about a sneeze, not a mental illness here. That's not the case at all. There's no such thing anywhere in [the Diagnostic and Statistical Manual of the American Psychiatric Association] that speaks about episodic schizophrenia. Now individuals who have that illness can have episodes of the illness, but these are episodes that last for weeks at a time, maybe even longer without treatment, and might get better with medication. Three or four years later or sooner if they stop their medication it comes back again over and over again. There

are episodes, but again, we're not speaking about instantaneous things like you implied. That doesn't exist.

{¶ 40} Dr. Sherman then testified how a schizophrenic can still know the wrongfulness of his acts:

Many times they know exactly what the wrongfulness is. For example, an individual who has a delusional belief that his wife is being unfaithful with Elvis Presley or something * * *. He might be hateful and mean and jealous but he knows that killing her is wrong. He's torn by jealousy. He might still kill her, but he knows it's wrong. Again, we're speaking about knowledge of wrongfulness rather than product of a mental illness. That's an old statute.

{¶ 41} In order for the trial court to find appellant guilty of murder in violation of R.C. 2903.02(B), the appellee must prove beyond a reasonable doubt that on June 16, 2015, appellant caused the death of the victim as the proximate result of committing or attempting to commit a violent offense, which does not constitute voluntary or involuntary manslaughter. "'Reasonable doubt' is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge." R.C. 2901.05(E)

{¶ 42} In this case appellee sought to prove the violent offense underlying the murder was felonious assault, in violation of R.C. 2903.11. Felonious assault is stated as "[n]o person shall knowingly do * * * the following: (1) cause serious physical harm to

19.

another * * *." R.C. 2903.11(A)(1). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. * * * When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." R.C. 2901.22(B).

{¶ 43} The record before this court shows multiple witnesses testified during the trial or through written reports that appellant admitted to stabbing the victim many times which caused the victim's death. In particular, the record includes Dr. Stinson's written report, which provides appellant's illuminating account of the murder as follows:

Mr. Christon found leftovers in the fridge, set them on the counter, and grabbed a knife to cut his roast beef. His brother came in * * *. Mr. Christon was unable to recall exactly what his brother said to him during this time, but Mr. Christon said his brother was yelling at him. His brother walked over to the freezer and opened it to find his burger box less full than he remembered. His brother asked Mr. Christon who had eaten them. Mr. Christon told his brother that he did not know, and his brother became infuriated, slamming the freezer closed.

Mr. Christon explained he knew he had not eaten his brother's burgers, and that his brother could be angry at times. Mr. Christon's brother then turned at him, and "yelled at me like he was going to do

20.

something to me." When asked what he thought his brother would do, Mr. Christon said, "Either swing at me or go for my mom or cousin." Mr. Christon continued to claim that his brother was becoming more hostile and he thought "somebody would get hurt." At that point, Mr. Christon began stabbing his brother. After his brother fell, he continued to stab him, doing so approximately 20 times. When asked why Mr. Christon continued to stab his brother after he fell, Mr. Christon stated, "I didn't want him to swing on me or go after somebody else." Mr. Christon further added, "Tony's a big dude – not tall, but he has some weight on him. If I'd stabbed him a couple of times and let go, he'd hurt somebody."

After the stabbing, Mr. Christon sat down on the sofa in the living room, and tried to decide whether or not he was going to call the police. At that point in time, Mr. Christon's mother came down the stairs, and his cousin [Mr. Lear] grabbed her and ran back upstairs to call the police. His mother called to him and asked him what happened, but Mr. Christon sat silently.

During my interview with him, Mr. Christon asked, "What was I going to say? He got in my face." He further added, "[My mom's] lucky my cousin grabbed her because I stabbed Tony many times, and I still had the knife in my hand. If she started yelling and tried to hurt me, [I] probably would have stabbed her, too."

Mr. Christon indicated that he continued to hold the knife until the police showed up. They removed the knife from his hands, cuffed him, and took him downtown. When asked what he was thinking about, Mr. Christon replied, "I wasn't even thinking about what was going to happen. It was already done."

**{¶ 44}** The trial court judge, who heard all the testimony and reviewed the evidence in the record, ultimately balanced the conflicting expert opinions between Drs. Stinson, Babula and Sherman as to appellant's criminal liability with the following analysis:

> The bottom line is you only need to look at the case from the view of the sergeant who was there while the defendant was still in the throws (sic) of whatever led him to stab this poor victim. The defendant's ability to hear the statement of the sergeant, demand of the sergeant, to set forth terms with which he would comply with the sergeant's demands, and to comply with those demands once the conditions were met. Once the victim was away, he dropped the knife. He engaged the sergeant in conversation. In order to believe Dr. Babula's position, it would almost have to be instantaneous onset of paranoid schizophrenia, followed by almost instantaneous disappearance of paranoid schizophrenia.

22.

In reading Dr. Stinson's report there was a statement made by the defendant as he outlined this crime and he indicated to Dr. Stinson that after he had stabbed his victim, he sat on the couch, went to the couch, sat down and thought about whether or not to call for help. So if you accept that statement from the defendant, his mental illness – I would have to find that his mental illness ceased the moment he ceased stabbing. And I do not find that to be true.

{¶ 45} Despite appellant's assertion, the trial court did not abuse its discretion evaluating the credibility between Drs. Babula and Sherman. In fact, the trial court ultimately did not rely on either opinion. The record reflects the trial court reached its conclusion that appellant failed to establish an affirmative defense of not guilty by reason of insanity by ample evidence in the record from other than Drs. Babula and Sherman. We will not disturb the trial court's findings. Appellant's first assignment of error is not well-taken.

{¶ 46} We reviewed the entire record in this case and do not find the trial court lost its way or created a manifest miscarriage of justice in determining appellant's guilt beyond a reasonable doubt for each element of Count 2. *State v. Reaster*, 6th Dist. Lucas No. L-03-1006, 2005-Ohio-4022, ¶ 53-64. Appellant's second assignment of error is not well-taken.

23.

**{¶ 47}** On consideration whereof, we find that substantial justice has been done in this matter and the judgment of the trial court to be lawful. The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.

_____
JUDGE

Thomas J. Osowik, J.

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

_____
JUDGE