[Cite as *State v. Sanders*, 2022-Ohio-2261.]

COURT OF APPEALS OF OHIO

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,              :

                                    No. 109598

    v.                               :

DEMARCUS SANDERS,                           :

    Defendant-Appellant.             :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 30, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-634379-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Francis Cavallo, Assistant Public Defender, *for appellant*.

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Demarcus Sanders ("Sanders"), appeals from his convictions following a bench trial. He raises the following assignments of error for review:

1. There was insufficient evidence produced at trial to support a finding of guilt.

2. The trial court erred by finding that defendant failed to establish his not guilty by reason of insanity ("NGRI") defense, pursuant to R.C. 2901.01(A)(14), by the preponderance of the evidence, finding the defendant guilty against the manifest weight of the evidence.

{¶ 2} After careful review of the record and relevant case law, we affirm Sanders's convictions.

## I. Procedural and Factual History

{¶ 3} On November 15, 2018, Sanders was named in a five-count indictment, charging him with aggravated murder in violation of R.C. 2903.01(A); aggravated murder in violation of R.C. 2903.01(B); aggravated robbery in violation of R.C. 2911.01(A)(3); murder in violation of R.C. 2903.02(B); and felonious assault in violation of R.C. 2903.11(A)(1). Each offense carried one- and three-year firearm specifications. The indictment stemmed from allegations that Sanders shot and killed the victim, K.L., on November 4, 2018.

{¶ 4} Based on Sanders's documented history of paranoid schizophrenia, he was referred to the court psychiatric clinic to assess his competency to stand trial and his sanity at the time of the incident. The case was subsequently transferred to the mental health docket on January 23, 2019.

{¶ 5} On July 17, 2019, the parties stipulated to the competency report submitted by the psychiatric clinic and agreed that Sanders was competent to stand trial. On August 6, 2019, Sanders was referred to the court psychiatric clinic for

further assessment of his sanity at the time of the incident pursuant to R.C. 2945.371.

{¶ 6} On January 9, 2020, Sanders entered a plea of not guilty by reason of insanity and requested an order appointing an independent expert. On January 10, 2020, the trial court granted Sanders's motion and granted him funds to undergo an independent psychological examination from forensic and clinical psychologist, John M. Fabian, Psy.D., J.D. ("Dr. Fabian").

{¶ 7} On January 27, 2020, Sanders executed a written waiver of a jury trial, and the matter then proceeded to a bench trial. As pertinent to this appeal, the following facts were adduced at trial.

## A. The State's Presentation of Evidence

{¶ 8} On behalf of the state, A.A. testified that he is employed as a cashier at Shop Express, a convenience store located on Warrensville Center Road in the city of Warrensville Heights, Ohio. On November 4, 2018, A.A. completed his shift at work and was entering his vehicle when he "heard two gunshots go off." (Tr. 34.) When A.A. got out of his vehicle to investigate the noise, he observed a man, later identified as K.L., being chased by a second man, later identified as Sanders. As the men ran southbound on Warrensville Center Road, A.A. observed Sanders stop at the corner of Kings Highway Boulevard to reload his shotgun. Sanders then continued his chase of the victim, and two additional shots were fired. When A.A. walked down the parking lot to obtain a better perspective, he observed Sanders standing over K.L.'s motionless body. Sanders then "look[ed] through [K.L.'s]

pockets" before fleeing on foot. (Tr. 35.) A.A. testified that he remained at the scene and spoke with the police when they arrived. A.A. further assisted the police in obtaining surveillance video from his convenience store.

{¶ 9} J.C. testified that on November 4, 2018, he was pulling into the Shop Express parking lot when he heard a gunshot and observed two men run past his vehicle. J.C. stated that it was evident the first man was being chased by the second man, who was holding a shotgun. J.C. testified that the men ran approximately one block before the man brandishing the shotgun shot the man he was chasing. J.C. stated that the shooter then stood over the victim and began "checking for something" on the victim's person. (Tr. 54.) J.C. later clarified that from his perspective, it appeared the shooter was "looking for something * * * between the [victim's] neck and pants area." (Tr. 54.)

{¶ 10} Officer Thomas Kazimer ("Officer Kazimer"), formerly of the Warrensville Heights Police Department, testified that on November 4, 2018, he responded to the scene of the shooting. Upon arrival, Officer Kazimer observed K.L. lying face down on the ground. Officer Kazimer testified that there was a large pool of blood under K.L.'s body and that "his pants were pulled down slightly to mid-thigh." (Tr. 77.) Officer Kazimer testified that he spoke with witnesses at the scene and learned that the shooter had fled the scene northbound on Warrensville Center Road. Based on this information, the responding officers began patrolling the area and a K-9 unit was used to set a perimeter around the scene.

{¶ 11} Detective Dennis Fossett ("Det. Fossett") of the Warrensville Heights Police Department testified that he was called to the scene approximately one hour after the shooting occurred. Once at the scene, Det. Fossett spoke with witnesses and viewed surveillance video footage obtained from nearby businesses, including Shop Express. Thereafter, Det. Fossett and responding officers began canvasing the area where the shooter was seen fleeing on foot. Det. Fossett testified that the officers recovered a yellow shotgun casing and a cell phone that was later identified as belonging to K.L. Two additional spent shotgun shells were recovered near the area where K.L.'s body was discovered.

{¶ 12} While Det. Fossett was waiting for a forensic team to secure the recovered evidence, he "noticed a resident at [a home located on] Warrensville Center Road looking out the side door." (Tr. 420.) Det. Fossett testified that he approached the home in an effort to determine whether the homeowner had any information pertaining to the shooting. However, the homeowner immediately locked the entry door and shut off the television and interior light as Det. Fossett walked up the driveway. Det. Fossett testified that he then knocked on the side door, but nobody answered. At that point, Det. Fossett had dispatch run the license plate of the vehicle parked in the driveway. He subsequently learned that the vehicle was registered to Sanders.

{¶ 13} After returning to the scene of the shooting, Det. Fossett learned that a resident in the area had provided detectives with video footage captured by the resident's home-security system.

{¶ 14} The video footage, marked state's exhibit No. 130, was played for the trier of fact as Det. Fossett described the events as they occurred. In pertinent part, the video depicts the events that immediately preceded the shooting. The video shows K.L. approach the same residence previously visited by Det. Fossett on Warrensville Center Road. K.L. walked up the driveway and knocked on the side door of the home. When no one responded, K.L. looked in the backyard of the property before returning to the driveway.

{¶ 15} While K.L. was waiting in the front yard, the video depicts Sanders arriving at his home on foot. He was pushing a lawnmower and was immediately confronted by K.L. Following a brief discussion, Sanders and K.L. walked up the driveway together, and Sanders pushed his lawnmower into the backyard. When Sanders returned to the driveway, he and K.L. spoke face-to-face for less than two minutes. Sanders then entered his home through the side door approximately 11:14 minutes into the video. At that time, K.L. walked down the driveway and stood near the sidewalk, where he remained for several minutes. Sanders then reopened the side door, and the men briefly exchanged additional words. Sanders then reentered his home, and K.L. continued to stand at the end of his driveway. At approximately 13:44 minutes into the video, Sanders exited his home a second time. On this occasion, however, Sanders was in possession of a shotgun and immediately began chasing K.L. down Warrensville Center Road in broad daylight, past residences, traffic, several businesses, and multiple witnesses for approximately 900 feet. Although the video does not capture the shots that ultimately killed K.L., the video

shows Sanders return to his home and enter the side door approximately three minutes after he exited his home with a shotgun.

{¶ 16} Based on the information gathered from the surveillance footage, Det. Fossett obtained a warrant to search Sanders's home and a SWAT unit was called to the scene. At approximately 1:54 a.m., members of the SWAT unit attempted to contact Sanders on his cell phone. They also used a public address system in an effort to facilitate a peaceful surrender. When their efforts proved to be unsuccessful, however, the SWAT unit launched tear-gas canisters into the home to flush Sanders outside. At approximately 5.00 a.m., members of the SWAT unit physically entered the home and took Sanders into custody. Sanders was found hiding under clothing on the floor of the upstairs bedroom. The shotgun was located under the bed in the bedroom.

{¶ 17} After the scene was secured, Det. Fossett entered Sanders's home to execute a thorough search of the residence. Det. Fossett testified that he confiscated several items discovered inside the home, including medication and a Daisy BB gun. Later that day, Det. Fossett obtained a DNA sample from Sanders and conducted an interview that lasted approximately one hour.

{¶ 18} Video footage of the interview, marked state's exhibit No. 133, was reviewed by the trial court outside the presence of the parties. During the interview, Sanders confirmed that he and K.L. were acquaintances. Regarding the events leading up to the shooting, Sanders stated that when he arrived home from mowing a nearby lawn, he was confronted by K.L., who was upset that Sanders had failed to

return a video game console he had borrowed. According to Sanders, K.L. began to push, shove, and threaten Sanders when Sanders told K.L. that he thought the video-game console was a gift and that he had sold it. Sanders stated that he asked K.L. to leave and he went inside his home.

{¶ 19} Sanders confirmed that he subsequently came out of his home with a shotgun and chased K.L. down Warrensville Center Road. Sanders stated that when he reached the victim, the victim fell. Sanders told him not to move and just get out of here, but the victim tried to fight and attack him, so Sanders had to shoot him. Sanders confirmed that he went through the victim's pockets following the shooting. However, he denied taking money from K.L. and claimed that he was making sure that K.L. had not taken any tools or items from his home. Sanders also expressed that he immediately ran home after the incident because he had left his side door open.

{¶ 20} When pressed to explain his conduct, Sanders indicated that he was afraid K.L. would return to his home and cause him harm. Accordingly, Sanders opined that he was defending himself and that shooting K.L. was not wrong. However, Sanders further expressed that he shot and killed the victim following their argument because he was upset that K.L. had refused to leave his property and was being "disruptive." Sanders further indicated that he did not cooperate with the SWAT unit's attempt to remove him from his home because he was asleep and startled by the commotion. He stated that he planned to call the police in the morning and explain that he was defending himself.

{¶ 21} Following his interview, Sanders completed a written statement, marked state's exhibit No. 134. The statement provides, in relevant part:

> I'm arriving home on 11/04/2018 after cutting grass for my landscaping business and this guy, who[se] grass I cut, comes over my house angry. He was actually already at my house when I got there. He began yelling at me and pushing on me. He was also following me around my yard. I told him to leave and then I went in the house. I wanted to make sure he was gone away from my house because I didn't feel safe. I looked outside and I saw that he was still there. He kept going up and down the driveway angrily. So I had to go outside and make sure he left the area around my house. I go outside and tell him to leave then he wouldn't so I felt threatened so I had to shoot him because I felt like I was going to be attacked. After a couple of minutes he ran off then I chased him to make sure he wouldn't come back because when he went in the parking lot of the store next to my house he was about to turn around. After that, I chased him again because he came after me after crossing through the parking lot. I chased him for a few more seconds and then he fell. I told him to stop and don't move, then he tried to fight me. He tried to fight me and attack me so I had to shoot him because I felt threatened. I planned to call the police today 11/5/18 to let them know what happened.

{¶ 22} James Kooser ("Kooser"), a firearm and toolmark examiner employed by the Cuyahoga County Regional Forensic Science Laboratory, testified that he performed forensic analysis on the shotgun and the three shell casings submitted for evaluation by the Warrensville Heights Police Department. Ultimately, Kooser concluded that all three shotgun shells recovered from the crime scene were fired by the shotgun recovered from Sanders's home.

{¶ 23} Erica Armstrong, M.D. ("Dr. Armstrong"), the deputy medical examiner and forensic pathologist for the Cuyahoga County Medical Examiner's Office, conducted an autopsy of K.L. Consistent with the findings rendered in her autopsy report, Dr. Armstrong testified that K.L. was shot in the back of the head

and that fouling deposited on K.L.'s skull indicated that the shooter was mere inches away from K.L.'s at the time the fatal blast was fired. K.L. also sustained a second gunshot wound to his "mid upper back area." (Tr. 239.) Dr. Armstrong testified that when the shotgun pellets dispersed inside K.L.'s body, they caused extensive internal injuries, including damage to his ribs, windpipe, and heart. Dr. Armstrong classified the manner of death as a homicide and confirmed that K.L. died "as a result of shotgun wound of head and shotgun wound of trunk with visceral, vascular, skeletal, and soft tissue injuries." (Tr. 253.)

{¶ 24} Christine Scott ("Scott"), a forensic DNA analyst employed by the Cuyahoga County Regional Forensic Science Laboratory, testified that she analyzed swabs taken from the shotgun recovered from Sanders's home, as well as swabs taken from the shotgun shells recovered near the scene of the shooting. Scott testified that, to "a reasonable degree of scientific certainty within the field of DNA analysis," she found that Sanders's DNA profile was consistent with the DNA recovered from various portions of the shotgun and the outer surface of the three spent shotgun shells. (Tr. 266-275.)

{¶ 25} Lisa Przepyszny ("Przepyszny"), a forensic scientist employed by the Cuyahoga County Regional Forensic Science Laboratory, testified that she was assigned to perform a trace evidence examination in this case. In the course of her analysis, Przepyszny collected evidence from the victim's body and examined his clothing for defects indicative of a "muzzle-to-target distance." Based on her observation of an entrance-defect on K.L.'s jacket, Przepyszny concluded that the

shooter was standing approximately three to six feet away from K.L. at the time he was shot in the back. In addition, Przepyszny stated that an entrance-defect found on K.L.'s hooded sweatshirt indicated that the shooter was standing approximately two to four feet away from K.L. at the time he was shot in the head. Finally, Przepyszny testified that she was able to confirm that a sample taken from Sanders's hands tested positive for gunshot-primer residue.

{¶ 26} At the conclusion of the state's case-in-chief, Sanders moved for a judgment of acquittal pursuant to Crim.R. 29, arguing that the state's evidence demonstrated that Sanders "lacked the central element of mens rea in all five counts of the indictment" due to his "severe mental illness." (Tr. 566.) Sanders further argued that the state failed to present sufficient evidence to show that he acted with prior calculation and design. Following an extensive discussion on the record, the trial court denied the motion for acquittal, and the defense proceeded with its case-in-chief.

## B. The Defense's Presentation of Evidence

{¶ 27} On behalf of the defense, Sanders's mother, Angela Hollis ("Mother"), provided an extensive history of Sanders's mental health issues. Sanders had been a fun-loving, outgoing young man with many friends. He was consistently an "A" student who was active in sports year-round and a standout in football, basketball, and track. At the age of 15 or 16, Sanders began to periodically smoke marijuana. Sanders was inducted into the National Honor Society, and received scholarships to attend Kent State University.

{¶ 28} Mother noticed a change in Sanders's behavior when it was time to take him to college orientation. Sanders seemed unusually anxious about leaving but appeared happy when his parents dropped him off at school. Mother observed that Sanders began talking to himself as she drove him back to campus after a weekend home visit. Sanders began to answer his phone less frequently and later told Mother he was seeing a counselor because he was struggling academically. Sanders's lack of reaction to a jogging suit gifted to him by Mother also disturbed Mother. "[H]e just looked like empty, like something was — something was wrong with him." (Tr. 764.) Sanders returned to school and "just kept calling and he just kept telling me he couldn't handle it * * * and he kept coming home." (Tr. 766.)

{¶ 29} Sanders's behavioral changes, particularly his paranoia, continued to build. Mother said Sanders "broke down and cried and said he can't take it, that he was very suspicious of his roommate having access to his computer password." (Tr. 770.) "And he thought his dad stole his social security number. He was just very paranoid and very tearful, like begging me, please, let him come home." (Tr. 770.)

{¶ 30} In early 2015, Sanders withdrew from college and moved in with Mother. Sanders was depressed and slept all day. Mother became increasingly concerned with Sanders's behavior, stating "some days he would be nice, the next day he'd just out of the blue just become irate like. Like I knew something was going on." (Tr. 772.) "[F]inally, this one particular day, [about two months after Sanders's return,] he finally left the house and I locked him out." (Tr. 772.) Mother testified

Sanders became angry and tried to kick her door down. Mother was afraid and called the police.

{¶ 31} Subsequent incidents led to Sanders's being involuntarily hospitalized in March 2015. On this occasion, Sanders locked himself in the hospital bathroom, was removed by police, and sedated. Subsequent outpatient therapy by Dr. Carol Lewis ("Dr. Lewis") was helpful for almost a year; however, Sanders's attempt to return to school was unsuccessful. Sanders moved back in with Mother for a month and was rehospitalized after an additional confrontation with Mother.

{¶ 32} Unable to cope with Sanders's behavior, Mother allowed him to live independently at the vacant home of his maternal grandfather. Sanders's mental health continued to decline. Mother testified that the house "was disgusting. It just progressively got worse and worse. There was garbage everywhere. There were empty liquor bottles, beer bottles, cigars. * * * And then he got a dog, and [there] was just dog poop [everywhere]." (Tr. 778.) A few days before the November 4, 2018 incident, Mother used her key to enter the house and was startled to see Sanders run from the first-floor bedroom to the attic. Mother left quickly, fearful of Sanders's paranoia.

{¶ 33} Following additional hospitalizations and instances of erratic behavior, Mother filed an application for guardianship of Sanders in the Cuyahoga County Probate Court on July 30, 2018. The application was accompanied by a medical report by Dr. Lewis.

{¶ 34} Dr. Lewis read a portion of the report into the trial record:

Demarcus is well known to me. He has schizophrenia and cannabis use disorder. He persists in his delusion that he has a fractured penis. He has had an extensive medical urological evaluation, all negative. He cannot care for himself, does not eat, or work, lives in squalor with dog feces throughout the house, does not pay attention to hygiene and misses nearly all of his medical appointments.

On July 5, 2018, I probated Demarcus to Lutheran Hospital due to his inability to care for himself. He has since been readmitted to St. Vincent's Hospital.

(Tr. 710.)

{¶ 35} The doctor diagnosed Sanders as "DSM-5 code for schizophrenia" that is a "severe mental illness." (Tr. 699.) Dr. Lewis testified:

What I ultimately decided was Demarcus Sanders suffers from two mental illnesses; one being primary schizophrenia, primary psychotic disorder, and also cannabis use disorder.

(Tr. 708.) The doctor concluded that Sanders was "decompensating" or "getting worse" and was unable to care for himself. (Tr. 688.) The report did not specify that Sanders posed a danger to others, but stated that he should "remain hospitalized for his own safety." (Tr. 703.)

{¶ 36} Sanders's father, Anthony Sanders ("Father"), confirmed the history of Sanders's mental illness. The last time Father talked with Sanders before his arrest, Sanders told Father that he was going to "come over and he was going to fight me." (Tr. 601.) "And I knew then [the schizophrenia] was super advanced, super bad, because he would never talk to me like that, ever." (Tr. 601.)

C. The Medical Experts

{¶ 37} Defense expert, Dr. Fabian, a forensic psychologist and neuropsychologist, testified that he was hired in this matter to evaluate Sanders and

render an opinion as to whether Sanders had a severe mental disease at the time of the offense and, if so, whether Sanders had the ability to understand the wrongfulness of his actions at the time of the incident. In the course of his psychological evaluation, Dr. Fabian reviewed pertinent police and medical records, the competency report authored by the court psychiatric clinic, and the various photographic, video-surveillance, and forensic evidence collected by the investigating detectives in this case. Dr. Fabian also spoke with members of Sanders's family and conducted an in-person interview of Sanders on March 22, 2019.

{¶ 38} In his written report, dated June 17, 2019, Dr. Fabian summarized Sanders's history of psychosis and depression, his prescribed psychotropic medications, his history of substance abuse, the nature and severity of his schizophrenia diagnosis, and his admissions into mental-health facilities for psychiatric evaluations. Dr. Fabian described Sanders's deteriorating relationship with his family and various instances of violence, irritability, and anger that were associated with Sanders's documented hallucinations and paranoid delusions. Dr. Fabian noted that Sanders had engaged in physical altercations with family members, had kicked his mother's door down, and had threatened to kill both of his parents. (Tr. 151.) During his latest inpatient hospitalization in July 2018, Sanders "was described as psychotic, paranoid, delusional, and internally stimulated with no insight into his own condition."

**{¶ 39}** Dr. Fabian's report also outlined Sanders's account of the events that occurred before, during, and after the shooting. According to Dr. Fabian, Sanders stated that he did not take his medication on the day of the incident and was "hearing voices." Although Sanders expressed that the voices did not command him to shoot K.L., he felt like his "thinking was cloudy," and that it was "hard to make decisions." Regarding the events that led to the shooting, Sanders explained that K.L. was upset that Sanders had sold a video-game console that K.L. had given to Sanders days earlier. Sanders stated that K.L. threatened him and "said he was gonna get somebody to kill me or he was gonna kill me." Believing these threats, Sanders "picked up his gun," "chased [K.L.], and then shot him about two streets down." Sanders conceded that he shot K.L. in the head and in the chest because "he wanted to make sure he was dead." Sanders further admitted that he went through K.L.'s pockets because "he owed me money for cutting grass."

**{¶ 40}** When asked why he determined it was necessary to shoot K.L. rather than contact the police or reason with K.L., Sanders stated that he was afraid K.L. "would come after him and possibly kill him." Sanders explained that he feared K.L. because K.L. had previously stated that he was wanted for murder in Jamaica and owned a pistol. Thus, in light of K.L.'s threats on the day of the incident, Sanders indicated that he acted in self-defense and "did not know what he did was illegal."

**{¶ 41}** Based upon his review of Sanders's mental-health history and the circumstances that led to the shooting-death of K.L., Dr. Fabian opined to a reasonable degree of psychological certainty that "Sanders had a severe mental

disease at the time of the commission of the offense and did not know the wrongfulness of his acts." In rendering his opinion, Dr. Fabian stated that it was his professional belief that "Sanders's criminal offenses were motivated by psychosis, such that there was no evidence of a rational motive, but rather his offending behavior was due to irrational paranoid and delusional beliefs." Dr. Fabian expressed that Sanders's fear of harm by K.L. was "unfounded and irrational, which led to him misperceiving the situation and overreacting with excessive force." He further opined that although Sanders's actions after the shooting may have been "representative of him having some knowledge of wrongfulness and behavioral consequence," it does not negate his "irrational motive at the time of the offense, which is the period of time that the insanity law emphasizes."

{¶ 42} At trial, Dr. Fabian reiterated the opinions rendered in his expert report. Relying on Sanders's escalating mental-health issues and his history of "severe paranoid thoughts [that] were not grounded in reality," Dr. Fabian opined that it is "very possible that [Sanders] believed irrationally that [K.L.] was going to harm him." (Tr. 155, 162.) However, Dr. Fabian testified that Sanders's belief that "he was in danger and needed to protect himself," must be considered in light of his history of paranoid delusions, his history of violent reactions to perceived threats, and his lack of insight into his own schizophrenia. In Dr. Fabian's view, Sanders's "schizophrenia compromise[d] [his] ability to really consider the illegal consequence of what he was doing." (Tr. 177.) Dr. Fabian explained his reasoning as follows:

We don't have a propensity for antisocial criminal violent conduct that's not psychotic related. * * * So at the time of the offense where he's committing this offense in broad daylight, in my opinion, the schizophrenia compromises his ability to know the legal consequences. There's an imminent threat. He thought he had to kill this person. He does not have a propensity to act that way, other than when he's psychotic. And he said quote, he was going to get somebody to shoot me or he was going to shoot me. I think he had other delusional thoughts that [K.L.] had told him that [K.L.] had killed a Jamaican man. So at that moment, it's my opinion he did not know what he was doing was wrong and he was overpowered by considering that, due to delusional paranoid, persecutory, irrational fears and beliefs.

(Tr. 174-175.) In conclusion, Dr. Fabian restated his "ultimate opinion * * * that [Sanders] had schizophrenia, a severe mental disease, and did not know the wrongfulness of his acts at the time of [his] conduct." (Tr. 184.)

{¶ 43} On cross-examination, Dr. Fabian rejected the state's suggestion that Sanders's voluntary marijuana use may have exacerbated his schizophrenia or caused a state of severe paranoia that was independent of his mental disease. In addition, Dr. Fabian conceded that NGRI defenses are complex and that it is possible that Sanders's motive to kill K.L. was predicated on rational anger that stemmed from their argument over the missing video-game console and Sanders's belief that K.L. owed him money for unpaid lawn-mowing services. However, Dr. Fabian reiterated his position that the motive advanced by the state was not plausible given Sanders's "benign criminal history" and his lack of "prior rational violence." (Tr. 211.) Thus, Dr. Fabian repeated that it was his professional opinion that Sanders's "mental illness was a primary factor in this offense," and that Sanders

shot K.L. "due to an imminent, paranoid irrational fear and he did not know right from wrong in the moment of shooting him." (Tr. 207.)

{¶ 44} In rebuttal, the state put forth its own expert, Stephen Noffsinger, M.D. ("Dr. Noffsinger"), of the Cuyahoga County Common Pleas Psychiatric Clinic. Dr. Noffsinger testified that he is a physician specializing in psychiatry and forensic psychiatry. In the course of completing his sanity evaluation in this case, Dr. Noffsinger reviewed Sanders's pertinent medical records, the competency and sanity reports previously completed by his colleague, Dr. Maria Lapchenko, and relevant evidence contained in the prosecutor's file, "including police reports and video related to the offense." Dr. Noffsinger also examined Sanders at the court psychiatric clinic on September 3, 2019.

{¶ 45} In his written report, dated September 17, 2019, Dr. Noffsinger summarized Sanders's medical history, Sanders's diagnosis at the time of the offense, the relevant evidence contained in the prosecutor's file, and Sanders's account of the offense. Dr. Noffsinger agreed that Sanders had a documented history of schizophrenia, "including delusions and hallucinations, and multiple psychiatric hospitalizations and outpatient treatment encounters for schizophrenia." Dr. Noffsinger further noted that Sanders was under the influence of marijuana at the time of his offense based on Sanders's admissions that he smoked marijuana that day and was "high and flying." However, Dr. Noffsinger believed, to a degree of medical certainty, that Sanders's severe mental disorder and

marijuana intoxication did not prevent him from appreciating the wrongfulness of his conduct.

{¶ 46} In support of his conclusion, Dr. Noffsinger relied on the following factors: (1) "Sanders stated that he did not experience symptoms of schizophrenia at the time of the offense which were a factor or motive for the offense"; (2) Sanders's "voluntary use of marijuana, and marijuana intoxication, caused Sanders to make 'bad decisions' about the offense"; (3) Sanders's behavior close in time to the offense indicated that Sanders understood he committed a wrongful act; (4) "Sanders [stated] that he committed the offenses due to his perceived need to act in self-defense"; (5) "there was not a psychotic motive for the offenses which would have caused Sanders to believe that the offenses were right"; and (6) "there was a rational motive for the offenses — the dispute between Sanders and [K.L.] about a Play Station 4 video game system, and money that [K.L.] reportedly owed Sanders for lawn mowing services."

{¶ 47} At trial, Dr. Noffsinger reiterated his position that Sanders's "schizophrenia did not cause him to not know the wrongfulness of the offense at the time of the offense." In Dr. Noffsinger's view, Sanders's sanity at the time of the offense was "not a close call." (Tr. 338.) He explained as follows:

> I think it's not a close call, because the contemporaneous evidence, what he said and did close in time to the offense, is so powerful and it's pretty much in one direction.
>
> * * *
>
> In this case, I think that * * * multiple reasons line up that indicate that he knew he had committed a wrongful act. It's a strong case in my mind

because there is little to no evidence that he believed he was doing the right thing. The only evidence of that would be, was it a misperceived self-defense, and we've got that covered. He did not have an imminent fear that he was in danger from [K.L.]. He thought he had a long-term danger from [K.L.], that he was going to take care of it by shooting him. But it was not imminent, therefore, it does not qualify as a [misperception], that would lead to insanity.

(Tr. 338.)

{¶ 48} Dr. Noffsinger further explained that the best indications of whether Sanders appreciated the wrongfulness of his actions is by observing what he did before, during, and after the offense. In this case, Sanders reported to Dr. Noffsinger that he was taking his medications in the days leading up to the offense and was functioning relatively normally. On the day of the incident, Sanders engaged in other activities that "indicated he was functioning pretty well from a psychiatric standpoint," such as running errands and earning money by cutting his neighbor's grass. With respect to Sanders's conduct during and after the incident, Dr. Noffsinger opined that Sanders's actions were not consistent with someone who was acting in self-defense or with a psychotic motive. Of significance, Dr. Noffsinger noted that Sanders chased the victim for an extended distance before shooting him twice at point-blank range. After the incident, Sanders immediately ran home, without contacting the police and hid the gun. Sanders further stated to Dr. Noffsinger that he did not contact the police because he feared they would view the situation negatively and that he "feared going to jail." (Tr. 337.) Sanders subsequently hid in his home and "had a prolonged standoff with the police." (Tr. 337.)

{¶ 49} Dr. Noffsinger explained that if Sanders had genuinely believed that it was necessary to act in self-defense based on a paranoid delusion, he would have continued to act in a matter consistent with his delusion. Dr. Noffsinger continued:

> The concept is called rationality within irrationality. If someone is acting on a delusion, we assess then, if that delusion were true, then would their actions have been rational and logical. So even if someone acting in a misperceived self-defense because of paranoia, you still expect them to act in a manner consistent with self defense. They would call the police. They would ask for help. If they believe they had done something right, there's no reason to not call the police because they haven't broken the law by acting in self-defense. You expect them to ask bystanders for help. You would expect them not to flee from the scene. You expect them to answer the door whenever the police come to the door. You would expect them to not hide the weapon or to hide upstairs. You would expect them to tell [their] friend whenever she calls, hey, I just shot someone, because if he believed that it was right, there would be no reason to not discuss that. But instead we have a series of behaviors that don't support the misperceived self-defense.

(Tr. 332-333.)

{¶ 50} Thus, Dr. Noffsinger believed that Sanders's conduct was predicated on a rational motive that related to the argument over a missing video-game console and Sanders's belief that the victim owed him money. (Tr. 334-335.) Dr. Noffsinger noted that

> [i]f you look at what Sanders did, the first thing he did after shooting [K.L.], I think that gives a clear view of what his motive was, was that he went through his pockets and took his money. So that to me implies robbery was among the chief motives for the offense.

(Tr. 335.)

{¶ 51} On cross-examination, Dr. Noffsinger expressed his belief that Dr. Fabian's ultimate opinion "glossed over the marijuana intoxication and the contemporaneous evidence," including what Sanders "said and did close in time to

the offense." (Tr. 346.).  Thus, Dr. Noffsinger testified that Dr. Fabian's opinion was incompatible with the evidence, stating:

> It's very powerful evidence, again, that he confronted the victim, he chased the victim, and he went through his pockets afterwards, that he fled the scene, hid the weapon, all those things.  There's no way you can take it into account and then conclude [Sanders] was insane.

(Tr. 346.)  However, Dr. Noffsinger clarified that Sanders's marijuana intoxication was just one of six factors he weighed in reaching his opinion in this matter.  He explained:

> Even if you subtract the marijuana intoxication altogether, there is strong multiple pieces of strong evidence that he was not legally insane.  Most heavily, the most important evidence, again, is * * * his behavior close in time to the offense.
>
> * * *
>
> Whether he was high or not high, the fact he fled the scene, didn't report the shooting, he started the confrontation, he chased him down, he shot him while he was on the ground, that he didn't answer the door for the police, that he hid upstairs.  That's all present, regardless of whether he's high or not.  It's all strong evidence.

(Tr. 352.)

## D.  Verdict and Sentence

{¶ 52} At the conclusion of trial, the trial court rejected Sanders's NGRI defense and found him guilty on all counts.  In support of its determination that Sanders failed to establish the NGRI defense, the trial court explained as follows:

> I do believe that Mr. Sanders at the time of the incident did suffer and continues to suffer from a severe mental disease or defect, that being schizophrenia.  In this case, though, that really wasn't the question.  The question was, did that disease, serious disease of defect, cause him not to know the wrongfulness of his actions.

* * *

The evidence that is in front of the court, and some of it, it can't be denied, is on video, so I don't even have to judge the credibility of witnesses.

Mr. Sanders chased an individual down on the street and shot him two times, once in the back and once in the head, killing him.

He then stayed on the scene for a number of minutes * * * [a]nd went through the victim's pockets, took money and then fled the scene. He went to his house. Upon the detective approaching the house he hid from the detective, shut the windows, locked the door.

As the night went on, and there's no getting around the fact that law enforcement was outside of the house at the time. They were calling his name on a speaker and they eventually sent teargas into the house and eventually had to make entry. And he was hiding from the police. All of that goes to the fact that he understood and appreciated the wrongfulness of his actions.

And the statements that he made to law enforcement, that he thought that they would think it was wrong, those are things that I consider as indicating that he understood the wrongfulness of his actions.

And then the statements made to the doctors, both Dr. Fabian and to Dr. Noffsinger. * * * And specifically, in [their] reports, Dr. Noffsinger and Dr. Fabian, you know, there are indications that the statements made by the defendant, that when he smokes marijuana, he makes bad decisions and he gets paranoid.

I believe he was paranoid. I don't have any doubt in my mind that there was a flavor of paranoia about what he believed [K.L.] would do to him. But his actions after the murder indicate to me that he understood the nature, that he understood that the murder, what he had done was wrong, was in fact wrong. Therefore, I do not believe the [NGRI] burden has been satisfied.

(Tr. 916-920.)

{¶ 53} At sentencing, the trial court determined that Counts 1, 2, 4, and 5 were allied offenses of similar import and the state elected to proceed with

sentencing on the aggravated-murder offense. Upon hearing from the parties, Sanders was sentenced to an aggregate sentence of "six years on the firearm specification[s] to be served prior to and consecutive with a life sentence with parole eligibility after 20 years." The sentencing entry also provides that Sanders "suffers from a severe mental disease or defect and shall be placed in housing that treats said mental illness appropriately."

{¶ 54} Sanders now appeals from his convictions.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 55} In his first assignment of error, Sanders argues the state failed to present sufficient evidence to support his aggravated murder conviction. Sanders contends that "the evidence adduced at trial, accepted as true for the purposes of this analysis, does not establish a sufficient basis for finding prior calculation and design."

{¶ 56} An appellate court's task when reviewing whether sufficient evidence supports a defendant's conviction is well-settled and familiar. The reviewing court asks whether "'after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102,

684 N.E.2d 668 (1997), fn. 4. "[A]n appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's 'credibility or effect in inducing belief.'" *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 16, citing *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

{¶ 57} In this case, the state charged Sanders with aggravated murder under R.C. 2903.01(A), which requires the state to prove Sanders caused the victim's death "purposely, and with prior calculation and design." In construing this element, the Ohio Supreme Court has held that the statute's own terms "suggest[] advance reasoning to formulate the purpose to kill." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18. "Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *Id.* Thus, it is not enough for the state to show that Sanders purposely killed the victim. Rather, the state needs to provide "evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *Id.*

{¶ 58} There is no bright-line test for determining whether a defendant's actions show a premeditated decision or studied consideration to kill. *Id.* at ¶ 19. "Instead, each case turns on the particular facts and evidence presented at trial." *State v. Taylor*, 78 Ohio St.3d 15, 20, 676 N.E.2d 82 (1997); *State v. Braden*, 98

Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 61; *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 148. Nevertheless, Ohio courts have traditionally considered three factors in determining whether a defendant acted with prior calculation and design:

> (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events?"

*Taylor* at 19, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).

{¶ 59} However, the *Taylor* factors are not dispositive. Courts should weigh these factors with the totality of the circumstances surrounding the murder to determine whether the evidence shows a defendant had the time and opportunity to plan a homicide and the homicide's circumstances "'show a scheme designed to implement the calculated decision to kill.'" *Maxwell* at ¶ 148, quoting *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph three of the syllabus.

{¶ 60} Applying the foregoing principles to the facts of this case, we must determine whether the trier of fact, believing the state's evidence and drawing all reasonable inferences in the state's favor, could find beyond a reasonable doubt that Sanders "acted with advance reasoning to formulate a purpose to kill [the victim]." *Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, at ¶ 18. Reviewing the evidence in a light most favorable to the state, this lead opinion concludes that a reasonable trier of fact could make such a finding in this case.

**{¶ 61}** As to the first *Taylor* guidepost, there is no dispute that Sanders and K.L. were acquaintances and that their relationship was strained based on a disagreement concerning Sanders's decision to sell K.L.'s video-game console and K.L.'s failure to pay him money owed for lawn-mowing services. Following their initial confrontation, Sanders went inside his home and K.L. remained in Sanders's front yard. Sanders indicated to the investigating detectives that K.L. continued to be disruptive and would not leave his property. Although appellate counsel attempts to minimize the seriousness of the argument between Sanders and K.L. on appeal, the record reflects that Sanders consistently expressed that K.L. verbally threatened to kill him or have him killed during the argument. Sanders also stated that he took K.L.'s threats seriously based on prior statements K.L. had made about being wanted for murder.

**{¶ 62}** As to the second and third *Taylor* guideposts, this lead opinion finds a reasonable trier of fact could have concluded that there was thought and preparation in choosing the murder weapon and the murder site and that the shooting was not an "instantaneous eruption of events." In this case, Sanders admitted during his initial psychiatric evaluation that he warned K.L. to leave his property "before I shoot you." (Dr. Fabian's report, p. 16 (June 17, 2019.) When Sanders returned outside and observed that K.L. had not left his property, he made the conscious decision to reenter his home to retrieve a shotgun from a concealed location. Before he exited his home, he loaded the shotgun and prepared it for firing. He then made the conscious decision to bring the loaded shotgun outside to confront

K.L. As depicted on the surveillance-video footage captured by a neighbor's security system, once Sanders exited his home, he began chasing K.L. down a public street. He then shot and killed K.L. less than 900 feet away from his home. Under the totality of the circumstances presented in this case, this lead opinion finds there was sufficient time and opportunity for Sanders to plan the act of homicide. He then took the necessary steps to bring that plan to fruition.

{¶ 63} Our holding is consistent with the Ohio Supreme Court's recognition that a defendant can conceive and execute a plan to kill, even if formulated within a few minutes, when there is evidence that the defendant's actions "went beyond a momentary impulse and show that he was determined to complete a course of action." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 442 N.E.2d 996, ¶ 46; *see also State v. Palmer*, 80 Ohio St.3d 543, 568, 687 N.E.2d 685 (1997). Although Sanders conceived his plan to kill in a short period of time, his deliberate decision to reenter his home to obtain and load his shotgun refutes Sanders's contention that the shooting was committed on the spur of the moment or after momentary consideration. In addition, there is ample evidence to conclude that once Sanders formulated his plan, he was determined to complete a course of action. In this case, Sanders was not deterred by the victim's attempt to flee. During the chase, Sanders fired his weapon and even stopped to reload in front of bystanders. The chase continued for approximately 900 feet before K.L. fell to the ground. Once Sanders caught up with the victim, he shot the defenseless K.L. in his mid-back and in the back of his head at point-blank range, resulting in horrifying and deadly

injuries. Collectively, these facts support the trier of fact's finding of prior calculation and design. *See State v. Harris*, 2017-Ohio-2751, 90 N.E.3d 342, ¶ 38 (8th Dist.); *Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, at ¶ 22 ("Pursuing and killing a fleeing or incapacitated victim after an initial confrontation strongly indicates prior calculation and design."); *Conway* at ¶ 45 ("[A] defendant's threat to obtain a weapon and kill his victim and his later actions carrying out the threat are enough to prove prior calculation and design."); *State v. Robbins*, 58 Ohio St.2d 74, 78-79, 388 N.E.2d 755 (1979) (defendant obtained a weapon from his apartment after fighting with victim in hallway, returned to hallway, and stabbed wounded, helpless victim to death). *See also Palmer* at 569-570 (after victim had fallen to the ground, defendant shot the victim in the head in an execution-style manner); *State v. Hough*, 8th Dist. Cuyahoga No. 91691, 2010-Ohio-2770, ¶ 19 ("[I]f the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design.").

{¶ 64} Finally, to the extent Sanders contends his schizophrenia "directly compromised his ability to process information properly on the day in question," this lead opinion finds this argument goes to the weight of the evidence and Sanders's burden to establish a NGRI defense. Arguments concerning Sanders's state of mind on the day of the incident are addressed in further detail within Sanders's second assignment of error.

{¶ 65} Based on the foregoing, and viewing the evidence in the light most favorable to the prosecution, this lead opinion finds the state presented sufficient

evidence that Sanders purposely caused the victim's death with prior calculation and design.  The first assignment of error is overruled.

## B.  NGRI Defense

{¶ 66} In his second assignment of error, Sanders argues the manifest weight of the evidence does not support the trial court's determination that he failed to establish the NGRI defense by a preponderance of the evidence.  Sanders contends that the greater weight of the evidence demonstrated that he did not appreciate the wrongfulness of his actions at the time of the act due to a serious mental defect.

{¶ 67} A manifest weight challenge concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.  *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 34.  In determining whether the conviction is against the manifest weight of the evidence, an appellate court "must weigh the evidence and all reasonable inferences from it, consider the credibility of the witnesses and determine whether in resolving conflicts, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Coldiron*, 12th Dist. Clermont Nos. CA2003-09-078 and CA2003-09-079, 2004-Ohio-5651, ¶ 24.  "This discretionary power should be exercised only in the exceptional case where the evidence weighs heavily against conviction." *Id.*

{¶ 68} The definition for the legal insanity standard is set forth in R.C. 2901.01(A)(14).  The statute provides that

[a] person is "not guilty by reason of insanity" relative to a charge of an offense only if the person proves, [by a preponderance of the evidence], that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts.

{¶ 69} The defendant's sanity is not an element of the offense the state must prove. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35. Thus, the state need not prove that the defendant was sane. *Id.* To the contrary, the NGRI defense is an affirmative defense. *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 64. "[T]he burden of proof, by a preponderance of the evidence, for an affirmative defense * * * is upon the accused." R.C. 2901.05(A). The accused must persuade the trier of fact that "at the time of the commission of the offense, the [accused] did not know, as a result of a severe mental disease or defect, the wrongfulness of the [person's] acts." R.C. 2901.01(A)(14).

{¶ 70} On appeal, Sanders argues that the greater weight of the evidence supports the "more comprehensive and fact-based conclusions" reached in Dr. Fabian's sanity-evaluation report. Sanders contends that the expert opinion of Dr. Noffsinger was undermined by his substantial reliance on Sanders's marijuana use and his suggestion that Sanders's alleged delusion did not constitute a sufficiently imminent threat to legally justify his conduct.

{¶ 71} It is well settled that when expert witnesses differ in their opinions regarding the insanity defense, the trier of fact must make a credibility determination when deciding which experts to believe. *State v. Murphy*, 4th Dist. Ross No. 15CA3475, 2016-Ohio-1165, ¶ 39. In this regard, the Supreme Court of

Ohio has held that "[t]he weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of the facts." *State v. Thomas*, 70 Ohio St.2d 79, 434 N.E.2d 1356 (1982), syllabus. If the record demonstrates that the trier of fact considered the insanity defense, the reviewing court should defer to the trier of fact's interpretation of the evidence. *See State v. Curry*, 45 Ohio St.3d 109, 114, 543 N.E.2d 1228 (1989). "'Indeed, a trial court's judgment as to the defense of insanity will be reversed only where overwhelming and uncontradicted evidence to the contrary is arbitrarily ignored.'" *Murphy* at ¶ 39, quoting *State v. Duncan*, 9th Dist. Medina No. 3117-M, 2001 Ohio App. LEXIS 4022, 22-23 (Sept. 12, 2001), citing *State v. Brown*, 5 Ohio St.3d 133, 136, 449 N.E.2d 449 (1983); *accord State v. Sudberry*, 12th Dist. Butler No. CA2000-11-218, 2001 Ohio App. LEXIS 5093 (Nov. 13, 2001).

{¶ 72} Because an insanity defense ultimately rests on the credibility and persuasiveness of the experts' testimony, appellate courts have consistently declined to second-guess the trier of fact's interpretation of the evidence in NGRI cases given the deferential standard of review. *State v. Cantrall*, 2017-Ohio-7399, 96 N.E.3d 1089, ¶ 53 (8th Dist.), citing *State v. Brown*, 6th Dist. Sandusky No. S-11-031, 2013-Ohio-839, ¶ 13-14, citing *State v. Ross*, 92 Ohio App. 29, 108 N.E.2d 77 (8th Dist.1952). *See also State v. Leisure*, 12th Dist. Preble No. CA2007-10-023, 2008-Ohio-6386, ¶ 18; *State v. Fenderson*, 5th Dist. Richland No. 09 CA 64, 2010-Ohio-2240, ¶ 62; *State v. Dunn*, 12th Dist. Clinton No. CA2019-05-009, 2020-Ohio-1183,

¶ 13; *State v. Johnson*, 1st Dist. Hamilton Nos. C-020256 and C-020257, 2003-Ohio-3665, at ¶ 48; *State v. Honnaker*, 1st Dist. Hamilton No. C-040684, 2006-Ohio-1374, ¶ 19; *State v. Ushry*, 1st Dist. Hamilton No. C-050740, 2006-Ohio-6287, ¶ 38; *State v. Davis*, 11th Dist. Lake No. 2019-L-170, 2021-Ohio-237, ¶ 202-204; *State v. Christon*, 6th Dist. Lucas No. L-16-1266, 2017-Ohio-9235, ¶ 45; *State v. Armstrong*, 152 Ohio App.3d 579, 789 N.E.2d 657, ¶ 17 (9th Dist.2003); *State v. Reynolds*, 6th Dist. Lucas No. L-16-1021, 2017-Ohio-1478, ¶ 55; *State v. Cochran*, 2d Dist. Montgomery No. 27023, 2017-Ohio-216, ¶ 56; *State v. Mitchell*, 2d Dist. Montgomery No. 26887, 2016-Ohio-7691, ¶ 19; *State v. Self*, 4th Dist. Ross No. 04CA2767, 2005-Ohio-1259, ¶ 13 ("If the record demonstrates that the jury has duly considered the insanity defense, a reviewing court should defer to the jury's interpretation of the evidence."); *State v. McNichols*, 2020-Ohio-2705, 154 N.E.3d 125, ¶ 10 (4th Dist.) ("[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court"); *State v. Harris*, 9th Dist. Medina No. 16CA0054-M, 2017-Ohio-8263, ¶ 22, citing *State v. Petrie*, 9th Dist. Summit, 2016-Ohio-4941, 69 N.E.3d 150, ¶ 17 (stating that due to the conflicting testimony from expert psychologists, "the evidence in this case is balanced, and in these circumstances, we cannot say that this is the exceptional case in which we must reverse the conviction as against the manifest weight of the evidence").

{¶ 73} Applying the foregoing to the circumstances presented in this case, this court is unable to conclude that the trial court lost its way when it found that

Sanders "understood and appreciated the wrongfulness of his actions." In this case, Drs. Fabian and Noffsinger each performed extensive investigations and evaluations and considered similar factors in rendering their expert opinions. Drs. Fabian and Noffsinger are both highly qualified, experienced, and well respected in their field. Each authored persuasive expert reports and offered articulate testimony in this case. Ultimately, the experts reached opposing conclusions based on their own interpretations of the relevant factors addressed in their sanity-evaluation reports. Such factors included the severity of Sanders's mental disease or defect, the possible implications of Sanders's marijuana use, and the inferences to be gathered from Sanders's conduct during the time periods before, during, and after the shooting.

{¶ 74} Given the conflicting evidence presented at trial in this case, the trial court acted within its discretion when it relied on Dr. Noffsinger's expert opinion that Sanders was capable of distinguishing right from wrong at the time he shot and killed the victim. Significantly, Dr. Fabian's testimony was neither overwhelming nor uncontradicted. As stated above, the issue of Sanders's mental health and his ability to appreciate the wrongfulness of his actions was highly contested at trial. Because there were no objective indicators that Sanders was experiencing a psychotic episode at the time of the incident, the applicability of the NGRI defense was dependent on the trier of fact's consideration of the relevant exhibits and its resolution of the contradicting expert opinions. This required the trial court to address issues of credibility that were exclusively for the court to resolve.

{¶ 75} Moreover, this is not the case where the trial court "arbitrarily ignored" the expert opinions rendered by the defense expert, Dr. Fabian. Rather, the record reflects that the trial court gave full and fair consideration to the opinions of each expert witness, but ultimately concluded that Sanders failed to establish his burden of proof. The trial court did not lose its way simply because it chose to believe the testimony of the Dr. Noffsinger over that of Dr. Fabian. *See State v. Saini*, 2d Dist. Greene No. 2013 CA 36, 2014-Ohio-5582, ¶ 35; *State v. Martino*, 12th Dist. Butler No. CA2017-09-139, 2018-Ohio-2882, ¶ 13 (a conviction is not against the manifest weight of the evidence merely because the trier of fact believed the prosecution testimony).

{¶ 76} This lead opinion finds no merit to Sanders's argument that by deferring to Dr. Noffsinger's expert opinion, the trial court arbitrarily adopted a NGRI standard that (1) overstated the implications of marijuana use; and (2) required Sanders to prove that his delusions, if rational, would have been justified as self-defense. In this case, Sanders's marijuana use and whether he believed K.L.'s threat of harm was imminent were two of several factors Dr. Noffsinger considered when determining whether Sanders's schizophrenia caused him to not know the wrongfulness of his acts. These issues were highly contested at trial, and Dr. Noffsinger was thoroughly cross-examined about the weight he afforded to these factors. Thus, the record contains comprehensive testimony concerning the strengths and limitations of Dr. Noffsinger's expert opinion and the trial court was

"free to believe or disbelieve any or all of the testimony presented." *State v. Maldonado*, 8th Dist. Cuyahoga No. 108907, 2021-Ohio-1724, ¶ 28.

{¶ 77} Under these circumstances, this lead opinion finds no basis to conclude that the trial court "turned its calculation as to [Sanders's] legal sanity upon whether his actions would have been legally justified, either in his badly compromised mind or if his sadly delusional beliefs had been true." The trial court's rejection of Sanders's NGRI defense did not hinge on whether the requirements of R.C. 2901.05, Ohio's self-defense statute, were satisfied.

{¶ 78} Rather, in addressing the issue of Sanders's state of mind at the time of the incident, the court relied extensively on the objective evidence presented at trial, including Dr. Noffsinger's references to Sanders's actions before, during, and after the victim was shot and killed. As previously discussed, this evidence demonstrated that following a verbal argument with the victim, Sanders went into his home and consciously took possession of a shotgun despite the availability of a BB gun. He then exited his home and immediately chased the victim down and shot him twice. Sanders then approached the victim and went through his pockets for money, i.e., an alleged source of his dispute with the victim. Sanders then fled to his home in an effort to avoid the police, whom he feared would view the shooting negatively and take him to jail. *See State v. Myers*, 10th Dist. Franklin No. 09AP-926, 2010-Ohio-4602, ¶ 17, citing *State v. Saleh,* 10th Dist. Franklin No. 07AP-431, 2009-Ohio-1542, ¶ 86 (Engaging in furtive conduct is reflective of a consciousness of guilt.).

{¶ 79} Finally, this lead opinion recognizes that there was much debate concerning Sanders's motive throughout the pendency of trial. Although Dr. Fabian opined that Sanders's mental illness caused him to perceive an illusionary threat that forced him to kill the victim in self-defense, Sanders's own statements suggest otherwise. During his subsequent interview with the investigating detectives, which occurred shortly after Sanders was taken into custody, Sanders expressly stated that he shot and killed the victim following an argument because he was upset that the victim refused to leave his property and was being "disruptive." (State's exhibit No. 133.) The record further reflects that Sanders's written statement indicated that he shot and killed the victim because he felt threatened when the victim "tried to fight and attack [him]." Thus, Sanders's own statements to the police indicated that he was acting in response to a direct threat of violence as opposed to a delusion that prevented him from understanding the wrongfulness of his actions. In addition, Dr. Noffsinger found other factors were indicative of a rational motive to kill, including the parties' dispute over missing property and unpaid money, as well as Sanders's act of taking money from the victim's pockets following the shooting. Accordingly, there was credible evidence presented at trial to support the trial court's conclusion that at the time Sanders chased the victim 821.65 feet and shot and killed him at point-blank range, he was not acting under such a level of paranoia that he was rendered insane as defined by the Ohio Revised Code. The trial court was therefore free to conclude that Dr. Fabian's opinion improperly conflated Sanders's subjective

belief that he did nothing morally wrong with the conclusion that he therefore did not know the wrongfulness of his acts under R.C. 2901.01(A)(14).

{¶ 80} Based on the foregoing, this lead opinion declines to disturb the trial court's conclusion that Sanders failed to overcome the presumption of his sanity by a preponderance of the evidence. The convictions, therefore, are not against the manifest weight of the evidence.

{¶ 81} The second assignment of error is overruled.

{¶ 82} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

MARY EILEEN KILBANE, J., CONCURS IN JUDGMENT ONLY;
ANITA LASTER MAYS, P.J., DISSENTS WITH SEPARATE DISSENTING OPINION

ANITA LASTER MAY, P.J., DISSENTING:

{¶ 83} I respectfully dissent from the majority's opinion and would find that the defendant-appellant Demarcus Sanders established his not guilty by reason of insanity (NGRI) defense, pursuant to R.C. 2901.01(A)(14), by the preponderance of the evidence and that the trial court erred when it found him guilty against the manifest weight of the evidence. I would reverse and remand this case for a new trial.

{¶ 84} There is no dispute that Sanders suffers from a severe mental disease, a fact conceded to by the parties' experts and specifically acknowledged by the trial court on the record. "I do believe that Mr. Sanders at the time of the incident did suffer and continues to suffer from a severe mental disease or defect, that being schizophrenia." (Tr. 916.)

{¶ 85} Thus, only the second prong of the statute is in issue here, the same query addressed by this court in *State v. Cantrall*, 2017-Ohio-7399, 96 N.E.3d 1089 (8th Dist.). Sanders's challenge to the weight of the evidence inquires "was the trial court's finding" that Sanders failed to "prove by a preponderance of the evidence that he was insane at the time of the acts against the manifest weight of the evidence." *Cantrall* at ¶ 51.

{¶ 86} The trial court determined that Sanders appreciated the wrongfulness of his acts at the time of the November 4, 2018 incident. "But [Sanders's] actions after the murder indicate to me that he understood the nature, that he understood

that the murder, what he had done was wrong, was in fact wrong." (Tr. 920.) "Therefore, I do not find that the burden has been satisfied." *Id.* After reviewing the trial court's findings and the entire record, I would reverse determining that there is overwhelming and uncontradicted evidence leading to a different conclusion. (Tr. 312.)

{¶ 87} Forensic psychologist and neuropsychologist Dr. John Fabian testified for the defense. Psychiatrist and forensic psychiatrist Dr. Stephen Noffsinger of the Cuyahoga County Common Pleas Court Psychiatric Clinic testified for the state. I would find that Dr. Fabian was more thorough and credible.

{¶ 88} Dr. Fabian evaluated Sanders on March 22, 2019, approximately four months after the incident, as documented in his 21-page June 17, 2019, report. Dr. Fabian conducted a broad investigation that included examinations of historical law enforcement and medical records for Sanders's multiple hospitalizations including toxicology reports and multiple medical diagnoses of schizophrenia and raging paranoia, police reports of violent incidents where Mother summoned police for assistance, and records relating to the instant case.

{¶ 89} Dr. Fabian also studied notebooks and writings by Sanders that reflected disorganized thoughts on various subjects including brainwaves and déjà vu. In addition, Dr. Fabian interviewed multiple family members who confirmed Sanders's evolution from an athletic, intelligent youth to an extremely paranoid and angry individual. Dr. Fabian emphasized the long history of increasingly paranoid-schizophrenic hallucinations and psychoses that manifested in 2014 and increased

in severity over the years. The doctor identified as significant Sanders's "paranoia, bizarre behaviors, lack of insight into mental condition, leading to noncompliance with medication, leading to dual diagnosis." (Tr. 148.)

{¶ 90} Dr. Fabian emphasized the long history of increasingly paranoid-schizophrenic hallucinations and psychoses that manifested in 2014 and increased in severity over the years. Also illustrative was Sanders's insistence that he fractured his penis in 2014 and the belief that the issue persists. Mother told Dr. Fabian that she visited Sanders in jail every two weeks but despite medication, his mind is still not right.

{¶ 91} Significant to Sanders's NGRI affirmative defense, Dr. Fabian also addressed Sanders's "self-medicating with marijuana, his drug of choice. He likes that effect. It calms him down. He doesn't like the effects of the psychiatric meds, and so he treats himself." *Id.* "But then [Sanders] lacks insight into the nature of schizophrenia, which is based as a psychotic disorder, which is founded in, you know, being a disorder of lack of contact with reality." *Id.* "So that's marked by hallucination and/or delusions." *Id.*

{¶ 92} Further to the issue of self-medication, an issue Dr. Noffsinger attributed to intentional and voluntary marijuana intoxication causing Sanders's psychosis, Dr. Fabian explained, "I am not seeing cases where someone would be psychotic from the marijuana." (Tr. 195.) "When I practiced in Kentucky, alcoholism has [been used with a diminished capacity defense], methamphetamine has. I do not see violent crimes due to marijuana." (Tr. 187.) "I see them due to

alcohol, cocaine, PCP, methamphetamines and toluene spray paint, not cannabis."
*Id.*

{¶ 93} Dr. Fabian disagreed that Sanders's "voluntary choice to take marijuana is exacerbating his schizophrenia." (Tr. 186-187.) "Because he had been psychotic, my understanding, profoundly leading to hospitalization when on and off marijuana. I think this would have happened without marijuana." (Tr. 187.) While Sanders stated to both experts that he felt the effects of marijuana, Dr. Fabian explained, "[I]n my opinion, this was evidence of the psychosis and there being more of like his belief [that] it was due to a drug. And we do not have any record of that." (Tr. 181-82.)

{¶ 94} Dr. Fabian also highlighted Sanders's intense paranoia about possible break-ins at the house and the purchase of the shotgun for protection that he told Dr. Fabian he always kept under the bed. This information is supported by the medical evidence, police reports, and Mother's testimony of multiple violent events as the schizophrenia and psychosis intensified.

{¶ 95} Sanders told Dr. Fabian that schizophrenia means he has trouble making decisions.[1] Sanders explained that he has experienced auditory hallucinations for years. "I think they know about my weaknesses." Dr. Fabian's report, p. 7 (June 17, 2019). The voices are from "strangers" who tell him things like he is "weak and nothing." *Id.* They do not give him commands but tell him things

---

[1] In contrast, Dr. Noffsinger testified that Sanders "believed that the marijuana caused him to make bad decisions with respect to the offense." (Tr. 319.)

like he is worthless. Dr. Fabian also said, "[Sanders] does not always feel like he is alive." *Id.* Sanders disliked being around other people and noise due to the voices that further added to his paranoia. (Tr. 150.)

{¶ 96} Multiple records cited by Dr. Fabian reflect Sanders's schizophrenia, paranoia, hallucinations, delusions, and anger. Sanders had threatened to kill his parents and a crisis worker and often required restraints though there was no marijuana use detected at the time of these events. Various types of medications had been prescribed including psychotropic, antipsychotic, and antianxiety medications.

{¶ 97} Dr. Fabian reviewed Sanders's written statement authored during the police interrogation and asked Sanders to recount the incident. Sanders stated he had not taken his medicine for a week and had smoked marijuana that day. He heard the usual voices saying things like "'I'll beat you senseless.'" Dr. Fabian's report, p. 13 (June 17, 2019).

{¶ 98} Sanders's description of the incident echoed those provided since the time of his arrest. Sanders told police and the experts that he was acting in self-defense. Sanders said that the victim told him that he was wanted for murder in Jamaica and owned a gun.[2] Sanders also told Dr. Fabian that he went through the victim's pockets because the victim owed him money for cutting the grass.

---

[2] Witness A.A. confirmed that K.L., a frequent store customer, was Jamaican.

{¶ 99} Dr. Fabian concluded that Sanders did not appreciate the wrongfulness of his actions at the time of the offense due to severe mental disease of schizoaffective disorder. Sanders's delusional psychosis caused Sanders not to "know what he did was illegal. He was defending himself. He thought he was being attacked. He thought he could be killed. I sensed that was an imminent threat." (Tr. 174.)

{¶ 100} Pertinent to Dr. Fabian's conclusion are Sanders's multiple hospitalizations, psychotropic medications, penile injury delusion, and documented paranoia, agitation, anger, impulsivity, psychosis, hallucinations, and depression.

{¶ 101} Dr. Fabian explained:

Witnesses and video surveillance reveal Mr. Sanders essentially chasing the alleged victim down the street in open plain view by many civilians walking, in stores, or in cars driving by * * * chasing the alleged victim with a shotgun in broad daylight. In my opinion, his chasing the alleged victim is bred out of paranoid delusions. * * *

Noteworthy to my opinion is my professional belief that Mr. Sanders's criminal offenses were motivated by psychosis, such that there was no evidence of a rational motive, but rather his offending behavior was due to irrational paranoid and delusional beliefs.

Dr. Fabian's report, p. 18-19 (June 17, 2019). "[T]he schizophrenia compromises his ability to know the legal consequences." (Tr. 175.)

{¶ 102} Dr. Fabian also emphasized that the account of what transpired between Sanders and the victim is exclusively from Sanders.

Mr. Sanders's fear of harm and/or death by [the victim], in my opinion, is unfounded and irrational, which led to him misperceiving the situation and overacting with excessive force. His overreaction with excessive force and shooting [the victim] was grounded in schizoaffective disorder and an acute active psychotic state at the time

with irrational and psychotic homicidal behavior. He essentially stated that [the victim] was threatening him, and his perception of threat was irrational and delusional. Mr. Sanders also said that he believed that [the victim] would come back and "get him and kill him."

Dr. Fabian's report, p. 20 (June 17, 2019).

{¶ 103} Finally, Dr. Fabian stated that the post-shooting behavior that state expert Dr. Noffsinger attributes to recognition of wrongfulness, even if true, does "*not speak to the irrational* motive *at the time of the instant offense, which is the period of time that the insanity law*" addresses. (Emphasis added.) *Id.* "[I]t is my opinion with a reasonable degree of psychological certainty that Mr. Sanders had a severe mental disease at the time of the commission of the offense and did not know the wrongfulness of his acts." *Id.*[3] "[I]n my opinion, schizophrenia compromises his ability to really consider the illegal consequence of what he was doing." (Tr. 177.)

{¶ 104} Dr. Noffsinger examined Sanders on September 3, 2019. Dr. Noffsinger reviewed Sanders's "long history of * * * symptoms and treatment for schizophrenia * * * evidenced in his medical records." (Tr. 317.) Though Dr. Noffsinger agreed that Sanders has a severe medical disease that includes psychotic beliefs, delusions, and hallucinations, Dr. Noffsinger attributed Sanders's actions to marijuana intoxication that does not qualify as a mental defect by law and voiced that marijuana can trigger psychosis. Dr. Noffsinger offered that marijuana possibly could intensify his paranoia or could possibly cause paranoia independent of

---

[3] We note that Dr. Fabian has testified for the defense in other NGRI cases. However, he has not always determined that the defendant qualified for NGRI. *See State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 74.

schizophrenia, notwithstanding that Sanders already suffered from paranoia. (Tr. 320.)

{¶ 105} Dr. Noffsinger conceded, as Dr. Fabian concluded, that it is possible that schizophrenic patients such as Sanders use marijuana to self-medicate and that it may not be the cause of psychosis. *See, e.g., In re E.R.*, 10th Dist. Franklin Nos. 17AP-82 and 17AP-84, 2017-Ohio-7188, ¶ 20 (The doctor "did not attribute [appellant's] psychosis to the marijuana use because [appellant] had symptoms even when not using."). The record in this case supports that Sanders had symptoms even when not using marijuana.

{¶ 106} As Dr. Fabian also advised, Dr. Noffsinger stated that one must focus on Sanders's actions at the time of the incident as the statute requires, what happened close in time, and the medical records close to the date of the incident. "[W]e do not take what the defendant says at face value, as accurate." (Tr. 313.) Dr. Noffsinger then explained that, based on what Sanders told him during the interview, Sanders appreciated the wrongfulness of his actions.

{¶ 107} Dr. Noffsinger concluded that Sanders's statement during the interview that he was employed meant that Sanders "was *probably* doing well from a mental health standpoint." (Emphasis added.) (Tr. 322.)[4] Dr. Noffsinger also relied on Sanders's account of Sanders's alleged activities on the day of the incident

---

[4] The record also reflects that Sanders was unable to maintain steady employment and did not appear to be employed at the time.

to conclude that Sanders was "functioning in a normal fashion, *at least according to his account.*" (Emphasis added.) (Tr. 323.)

{¶ 108} Next, Dr. Noffsinger explained that sometimes, but not always, schizophrenics hear voices that "give commands either to do legal or illegal activities." (Tr. 327.) Sanders told the doctor that he heard the usual voices, but the voices did not tell him to act. This indicated to Dr. Noffsinger that Sanders was rational at the time.

{¶ 109} Sanders maintained during his interview with the doctor that "I was afraid he wouldn't go away. I should have just called the police. I knew he would come back because he had threatened me." (Tr. 328.) From that statement Dr. Noffsinger concluded, "So it's clear he viewed the shooting now *ten months later as a wrong thing to do, but flowing from his impaired judgment from his marijuana use at the time.*" (Emphasis added.) (Tr. 329.)

{¶ 110} During a difficult cross-examination, Dr. Noffsinger admitted that Sanders "did have some concern, some worry, that [the victim] would harm him." (Tr. 361.)[5] "But, it was not imminent." *Id.* Notwithstanding Sanders's consistent statements, Dr. Noffsinger offered that Sanders sanely determined that he would address the threat of the victim's return. "And that's why he shot [the victim.]" (Tr. 361.) The doctor also speculated that the PlayStation or mowing fee might have been motives.

---

[5] Sanders stated the victim threatened to kill him and told him that he was already wanted for murder.

{¶ 111} Dr. Noffsinger explained that to demonstrate a perceived self-defense due to psychosis as the doctor noted in his report, Sanders would have to behave the way that a rational person acting within the legal framework of self-defense would behave. The legal element of imminent threat was missing, but the doctor stated Sanders was not expected to know the elements of self-defense.

> Counsel: Do you believe that he was speaking to you from a legal perspective, that he was trying to establish a self-defense?
>
> Witness: I don't think so, no, because it was clear that he didn't know the legal definition of self-defense. He told me he perceive[d] self-defense, but he did not know that self-defense requires imminence.
>
> Counsel: *Aren't we only inquiring about what his sensory experience was, what he felt, what he believed at the time, which was, he needed to defend himself?*
>
> Witness: *No. He can be ignorant for the test for self-defense, but that's not due to his schizophrenia. His schizophrenia symptoms have to cause him to believe he's acting in self-defense.*

(Emphasis added.) (Tr. 365.)

{¶ 112} The record supports Sanders's consistent position of perceived self-defense at the time of the incident, during the police interrogation and statement, and through his interviews. Though Dr. Noffsinger stated in his report that Sanders had a perceived need for self-defense, he verbally amended his statement to perceived "long-term self-defense" based on counsel's questions. (Tr. 366.)

{¶ 113} Dr. Noffsinger consistently relied on what Sanders told him though he testified that the best indication of whether Sanders's appreciated the wrongfulness of his actions is by observing what he did at the time of the incident.

When challenged about conclusions regarding what Sanders did at the time of the incident, he relied on what Sanders told him.

{¶ 114} The doctor also rejected self-defense because Sanders: (1) fled the scene, (2) did not report the shooting to passersby or police, (3) feared police would view the situation negatively, (4) feared that police would take him to jail, and (5) did not tell his friend Brittany about the incident when she called him later that day. Dr. Noffsinger also concluded that Sanders hid the shotgun to indicate knowledge of wrongfulness, though the record indicates that Sanders returned the shotgun to the place it was kept. The doctor said these steps do not comport with what a rational person would do acting in self-defense, but the doctor determined that Sanders was rational at the time.

{¶ 115} Sanders repeatedly stated that he ran home because he left the door unlocked which is consistent with his medical history of severe paranoia, did not answer the door when the police first stopped by because he was tired and had planned to call police the next day, did not attempt to leave the premises though his car was in the garage, and hid under blankets in the bathroom when startled by the SWAT team. Dr. Noffsinger rejected Sanders's consistent explanations of the events based on Sanders's belief at the time. The doctor said, "I really don't believe that * * * because there's a more likely motive" that he ran home because he knew he committed a crime. (Tr. 372.) "Doesn't make sense." *Id*. Dr. Noffsinger does not share how or why the choices of a delusional paranoid schizophrenic would or should conform to the doctor's view of logical, rational behavior.

{¶ 116} Dr. Noffsinger was questioned about his reliance on Sanders's statement that he was high from the voluntary use of marijuana as the key to Sanders's psychosis though not taking Sanders at face value. Dr. Fabian opined that Sanders sometimes confused the effects of marijuana with the effects of schizophrenia. Dr. Noffsinger countered, "[a]nything is possible, but I don't think that's the case here." (Tr. 374.)

{¶ 117} The defense challenged:

Counsel: So in his previous psychoses where he was hospitalized, and I'll call your attention to his hospitalization at University Hospital[s] Richmond Medical Center of January 21st to February 3rd, 2016. This is the episode where he's psychotic and he's violent and he's threatened to kill his parents, and the intervention team came. And he was — had a toxicology *and there was no marijuana* [use or intoxication].

So wouldn't that suggest to you that his disease is inclined to make him [behave] that way, irrespective of the marijuana?

Witness: Yes, I think that is a possibility, sure. And that sounds like that was likely the situation during that hospitalization. But I would differentiate that from this offense.

(Emphasis added.) (Tr. 380-381.) Dr. Noffsinger then shifted to what Sanders told him during their interview almost a year after the incident and said Sanders was functionally well for "days or weeks before the offense due to symptomology." (Tr. 382.)

{¶ 118} Notwithstanding the similarity in symptoms between the 2016 hospitalization event and current incident, the lack of a toxicology report at the time of the current incident, and Sanders's unrebutted history of increasingly severe

delusional, paranoid schizophrenia and psychosis without evidence of marijuana consumption, Dr. Noffsinger insisted, based solely on what Sanders told him almost a year after the incident, that he was taking his medicine and was functioning normally the day of the incident. The doctor determined the cause was voluntary marijuana intoxication though Dr. Lewis, who attended Sanders during his earlier hospitalizations, testified that Sanders's mental health did not consistently improve during periods of abstinence from marijuana. (Tr. 712.)

{¶ 119} The trial court adopted Dr. Noffsinger's determination that Sanders did not behave as an individual who did not understand the wrongfulness of his actions due to his failure to act consistent with a legal definition of self-defense. The trial court agreed that Sanders was paranoid due to voluntary marijuana consumption and alluded to Sanders's later statement allegedly to Dr. Noffsinger "that when he smokes marijuana, he makes bad decisions and he gets paranoid." (Tr. 919.) The trial court did state that there was no question that his mental illness played a role.

{¶ 120} In *State v. Kister*, 2014-Ohio-4596, 21 N.E.3d 610 (4th Dist.), the defendant was convicted of telecommunications harassment. Kister made a bomb threat to the Ohio Department of Mental Health ("ODMH"). Kister had an extensive history of mental-health problems. A state trooper contacted Kister by telephone who denied the charges and asked that charges be filed against the ODMH. Kister pleaded NGRI.

{¶ 121} A clinical and forensic psychologist who had a history with Kister testified that Kister had

> paranoid schizophrenia, a severe mental disease that * * * "affects one's ability to think clearly, rationally, [and to] organize one's thoughts." Dr. Malawista further indicated that Kister's "condition, his ability to filter is directly related to the level of his disturbance at one particular moment[,]" and that his ability to appreciate the wrongfulness of his actions "depends on the day and circumstance."

*Kister* at ¶ 6. The doctor "explained that people with paranoid schizophrenia 'see the world quite differently than average people, people that do not have [the] condition.'" *Id.* at ¶ 7. As far as the lucid conversation that Kister had with the trooper the same day of the incident, the doctor stated, "It is entirely possible that while Kister may have appreciated the wrongfulness of his actions when he spoke to Trooper Moorehead, he may not have had the same appreciation six hours prior when the crime was committed." *Id.* at ¶ 20.

{¶ 122} I am aware that "'[t]he weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of fact.'" *Cantrall*, 2017-Ohio-7399, 96 N.E.3d 1089, at ¶ 53, quoting *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982).

{¶ 123} I reiterate that the sole issue here is whether Sanders's severe mental disease prevented him from appreciating the wrongfulness of his acts. Because the admittedly serious level of Sanders's disease alters perspectives and thought processes, coupled with the extreme paranoia, psychotic delusions, internal voices,

the consistency of his statements regarding the incident and the irrational conclusions, I do not agree that Sanders understood that what he did was wrong.

{¶ 124} This court recognizes that both experts are reputable, qualified experts in the field. Dr. Fabian's report is based on comprehensive reviews of multiple sources including the medical history, interviews with family members, employment history, review of the evidence in the case, arrest history, and the history correlated by Sanders's conduct at the time of the act versus possibilities. Sanders stated repeatedly and consistently that he was defending himself based on what the evidence supports is an irrational understanding of the incident.

{¶ 125} Dr. Fabian's testimony and report consider the range of possible conclusions and explained why he determined that Sanders did not realize the wrongfulness of his actions. Dr. Fabian unwaveringly attributed the events to Sanders's long history of paranoid schizophrenia, psychosis, anger, and accelerating decompensation. The record also supports that Sanders has had severe events involving threats and violence where no marijuana use was detected. This is supported by Dr. Lewis.

{¶ 126} On the other hand, Dr. Noffsinger said he simply did not believe Sanders because the video unit and mowing money could possibly be motives. "Doesn't make sense." (Tr. 371.) Thus, Dr. Noffsinger relied on marijuana-induced psychosis coupled with his interpretation of how Sanders should have behaved after the act.

{¶ 127} To that end, Dr. Fabian also commented on Dr. Noffsinger's opinion that Sanders's statements to police indicate knowledge that the behavior was wrong. "[W]hen you are in a police station, someone with schizophrenia certainly can be, oh, wow, I'm in trouble. I'm handcuffed. I'm in custody. God, what did I do. These things pass through a schizophrenic's mind." (Tr. 180.) This possible after-the-fact recognition does not impact the legal question of what Sanders recognized during the incident. It is also true from the record that Sanders repeatedly asserted self-defense and thought he would be able to go home after he explained that to the police.

{¶ 128} Finally, though reaching different conclusions, both doctors determined that the incident occurred due to psychosis. Months after the incident, Sanders told the experts that he smoked marijuana that day. There was no toxicology report. There is no dispute that Sanders suffered from extensive mental decompensation due to schizophrenia including severe paranoia and psychosis. Dr. Fabian's conclusion is based on the historical record of violent irrational behavior with and without the presence of marijuana and the irrational behavior surrounding and during the incident. Dr. Noffsinger decided the psychosis was due to marijuana because that's what Sanders said.

{¶ 129} I agree with the trial court's observation that Sanders's serious mental illness clearly played a role in this incident and that but for the illness, it probably would not have happened. Based on a thorough review of the record and the unique circumstances of this case, I would find that Sanders established by a

preponderance of the evidence that he did not appreciate the wrongfulness of his actions at the time of the act due to serious mental defect.  My decision shall not be construed in any way to minimize the seriousness of this heinous act.